COMMERCIAL UNION INSURANCE COMPANY, Plaintiff-Appellant, Cross-Appellee,

v.

INTERNATIONAL FLAVORS & FRAGRANCES, INC., Defendant-Appellee, Cross-Appellant.

Nos. 442, 535, Dockets 86–7691, 86–7701.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1986.

Decided June 23, 1987.

Walter Williamson, New York City (David S. Ratner, Nancy Berger, Williamson & Williamson, New York City, of counsel), for plaintiff-appellant, cross-appellee.

George Rowe, Jr., New York City (Michael J. Gayor, Fulton, Duncombe & Rowe, New York City, of counsel), for defendant-appellee, cross-appellant.

Before OAKES, CARDAMONE, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Commercial Union Insurance Company ("CU") brought this declaratory judgment action in the Southern District of New York seeking a determination that it had no duty either to defend or to indemnify its insured, International Flavors and Fragrances, Inc. ("IFF"), in a product liability action brought against IFF by Plough, Inc. ("Plough"). IFF counterclaimed for the amounts it had expended in defending and settling the Plough action and for its attorneys' fees in the instant case. After a jury verdict in favor of CU, Judge Pollack set aside the verdict to the extent that it denied IFF reimbursement for its costs in defending the Plough suit and ordered a new trial on that issue. *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 633 F.Supp. 646 (S.D.N.Y.1986). The jury in the second trial found that IFF was entitled to recover all of its costs of defending the Plough suit. Judgment was entered for IFF in the amounts of $834,913 for its costs in the Plough action and $372,-597.20 for its costs in the instant case, 639 F.Supp. 1401.

Both parties have appealed. Because the first jury properly found that IFF failed to comply with a provision of its insurance policy requiring it to give timely notice to CU of a relevant occurrence, we hold that judgment n.o.v. was improperly granted and order that judgment be entered for CU.

## BACKGROUND

CU issued a comprehensive liability policy to IFF in 1976. It was renewed each year through 1979. The policy contained the usual promises to indemnify for losses and to provide a defense in lawsuits within the policy's coverage. It also required as a condition of coverage that IFF give written notice to CU "as soon as practicable" of an "occurrence" relevant to the coverage.

In July 1975, Plough asked IFF to provide it with a banana-coconut fragrance that would be compatible with the mineral base of Plough's newly-developed Tropical Blend suntan lotion. Plough was already buying a banana-coconut fragrance compatible with the base of its Tropical Blend suntan oil from Perry Brothers, Inc. Plough provided IFF with a sample of the Perry Brothers fragrance, and IFF created a similar fragrance for use in the Tropical Blend suntan lotion. IFF supplied Plough with about 62,000 pounds of that fragrance from 1975 to 1977 at a total price of about $772,000. The IFF and Perry Brothers fra-

grances both contained 6–methyl coumarin ("6–MC"), a fragrance and flavoring agent that had been widely used without incident in foods, cosmetics, and toiletries since the 1920's.

Sometime during 1975 or 1976, Plough began receiving complaints of adverse skin reactions following use of its Tropical Blend products. On July 30, 1976, Plough's chief toxicologist, Dr. Eden F. Keith, informed IFF's chief toxicologist, Dr. Otho D. Easterday, that fifteen persons had reported such skin reactions. Dr. Keith explained that three of these persons had required hospitalization and that Plough had communicated the problem to the United States Food & Drug Administration ("FDA"). Dr. Easterday was also advised by Plough that there was no evidence that IFF's fragrance was involved. He nevertheless reported the July 1976 complaints to two senior IFF executives, President Eugene P. Grisanti and Vice President Joseph T. Bannan.

Dr. Easterday, who became a vice president of IFF in May 1977, consulted repeatedly over the next year with his counterparts at Plough as they attempted to identify the cause of the adverse skin reactions. On June 23, Plough executives John M. Clayton and Edward Marlowe met to discuss the skin reaction problem with Dr. Easterday and other IFF personnel. Dr. Clayton stated that there had been fifty reports of skin reactions, ten of which had been validated by physicians. Dr. Easterday knew that there were between nine million and twenty million units of Tropical Blend "in the field" at this time. He did not know how many of these had been purchased by consumers and how many were still held by wholesalers or retailers.

On the basis of new clinical tests, a group of dermatologists concluded in July 1977 that the Tropical Blend skin reactions were photoallergenic in nature and were caused by 6–MC. On September 9, 1977, Dr. Clayton reported these results to Dr. Easterday, who agreed that 6–MC appeared to be the ingredient that was causing skin reactions in Tropical Blend users. IFF executives Grisanti and Bannan were also made aware of this conclusion by autumn 1977. By this time, Plough had returned the unused fragrance containing 6–MC, for which IFF gave Plough a credit of about $18,000. At Plough's request, IFF reformulated the fragrance without 6–MC and supplied it to Plough through 1978. Tests by outside laboratories subsequently confirmed that 6–MC was the source of the Tropical Blend skin reaction problem. In December 1977, Dr. Easterday learned that Dr. Albert Kligman of the University of Pennsylvania Department of Dermatology had concluded that 6–MC was the most potent photoallergen he had ever encountered. One year later, on December 2, 1978, the FDA informed IFF by telegram that 6–MC was being banned from use in suncare products.[1] IFF informed its insurance broker of the FDA's action in a letter dated December 8, 1978.

On March 14, 1979, Plough filed an action against IFF and Perry Brothers in federal district court in Memphis, Tennessee. Plough alleged that the allergic reactions from the 6–MC ingredient in the fragrances produced by IFF and Plough had caused it to incur $10,000,000 in damages, including the loss of millions of units of Tropical Blend containing 6–MC, the expenses of research and testing, the costs of

---

1. Plough and the FDA had been in contact in 1977 and 1978 concerning reactions to Plough's suntan products, during which time the FDA honored Plough's request to keep their meetings and correspondence confidential. In December 1978, however, over Plough's objections, the FDA required Plough to recall any units of Tropical Blend containing 6–MC still on the market. The telegram stated in pertinent part:

THERE NOW EXISTS AMPLE EVIDENCE THAT [6-MC] ... IS A POTENT PHOTOCONTACT ALLERGEN, RESPONSIBLE FOR A SIGNIFICANT NUMBER OF ALLERGIC RE-

ACTIONS.... PHOTOCONTACT ALLERGY MAY HAVE SERIOUS HEALTH CONSEQUENCES ... AND LEAD TO A SEVERE CHRONIC CONDITION ... WE ARE PARTICULARLY CONCERNED ABOUT THE PRESENCE OF THIS SUBSTANCE IN SUNTAN OR SUNSCREEN PREPARATIONS BECAUSE OF THEIR OBVIOUS INTENDED USE IN SUNLIGHT. WE BELIEVE SUCH PRODUCTS CONTAINING THIS SUBSTANCE POSE A SUBSTANTIAL HAZARD TO CONSUMERS AND SHOULD IMMEDIATELY BE REMOVED FROM THE MARKET.

handling and settling consumer claims and lawsuits, lost profits, and other costs associated with the Tropical Blend problem.

Upon receiving the complaint, IFF notified CU of the lawsuit. It is undisputed on appeal that the allegations of the Plough complaint fell within the policy's products hazard clause. Further, CU was obligated under the policy to defend IFF in any suit that implicated coverage regardless of whether the allegations were groundless.

On April 17, 1979, a Memphis law firm, Holt, Batchelor, Spicer & Ryan, notified IFF that it had been retained by CU "regarding representation of" IFF. IFF's outside general counsel, the New York firm of Fulton, Duncombe & Rowe, requested that it also be listed as counsel of record. The litigation proceeded uneventfully, with the Fulton firm initiating pretrial motions and providing supporting documents to be filed in Memphis by the Holt firm. In correspondence dated May 3 and May 16, however, the Holt firm informed the Fulton firm that CU had not yet confirmed its coverage.[2] On May 31, 1979, CU notified IFF that there appeared to be "no coverage" due to "late notice and other policy violations" and that CU was "proceeding to investigate ... with a complete reservation of all rights under the policy." IFF refused to allow CU to defend it under such terms and instructed the Fulton firm to retain other Memphis counsel. CU thereafter withdrew its defense of the suit. On July 8, 1980, CU wrote to IFF reiterating its denial of coverage.

On November 26, 1980, CU filed the instant action in the Southern District seeking a declaratory judgment that it had no duty either to defend or to indemnify IFF in the Plough action because IFF had not given timely notice of a relevant occurrence. The court stayed CU's action pending the outcome of the Plough case. The Plough case went to trial on November 14, 1983, and was settled by IFF for $750,000 on November 21, 1983. IFF then counterclaimed against CU in the instant action for the amounts it had expended to defend and settle the Plough case and for its attorneys' fees in this case.

At trial, CU claimed that IFF should have known by September 1977 that Plough might sue it for damages caused by the fragrance. IFF contended that it had no reason to anticipate a lawsuit until the actual filing of the complaint in March 1979 and that its failure to notify CU earlier was excused by its good faith belief of nonliability. The district court instructed the jury to "report a general verdict" for either IFF or CU. The jury found that "IFF is not entitled to damages," and, upon questioning by the courtroom clerk, each juror affirmed that his or her verdict was for CU.

IFF then moved for judgment n.o.v. or for a new trial. Judge Pollack granted IFF's motion in part and denied it in part. *Commercial Union*, 633 F.Supp. 646. He first concluded that a breach of the notice-of-occurrence clause was not a proper basis for CU to refuse to defend the Plough lawsuit. *Id.* at 649. He further determined that by "unconditionally" undertaking IFF's defense in the Plough action from the outset, CU could not thereafter "renege." *Id.* at 650. Holding that CU had breached its duty to defend IFF, Judge Pollack set aside the verdict to the extent that it denied IFF reimbursement for its costs in defending the Plough action. *Id.* at 651.

With regard to whether CU had a duty to indemnify IFF for the amount paid in settling the Plough case, Judge Pollack opined that the issue was a "more difficult one." *Id.* at 652. He observed that there was substantial evidence that IFF executives had a good faith belief in nonliability during the relevant period. *Id.* at 652. However, he concluded that there was evidence

---

**2.** In a letter dated May 3, 1978, a Holt attorney wrote to his Fulton counterpart that he would pass on CU's comments concerning the Fulton firm's proposed motions "[a]s soon as I have heard from Commercial Union, who I understand is attempting to confirm what coverages, if any, they have in reference to this subject matter of the Complaint." In confirming receipt of the Fulton firm's legal memorandum on May 16, the same attorney wrote, "I have not yet been advised by Commercial Union concerning their confirmation of coverage or the position which they wish to take concerning coverage of International Flavors and Fragrances, Inc."

from which the jury could have found that IFF had sufficient reason in September 1977 to anticipate litigation. *Id.* He also noted that New York law required strict compliance with a notice-of-occurrence provision. *Id.* at 653. Judge Pollack therefore let stand that portion of the jury verdict denying IFF compensation for the Plough settlement. *Id.*

Judge Pollack granted IFF a new trial to determine its reasonable costs incurred in the Plough action and the present case. He also conditionally granted IFF's alternative motion for a new trial in the event the judgment n.o.v. was vacated or reversed, explaining "that the jury's verdict denying IFF reimbursement for its defense costs was clearly against the weight of the credible evidence." *Id.* at 653–54.

At the second trial, the jury found that IFF was entitled to recover all its costs of defending the Plough action. On July 22, 1986, the district judge entered judgment in favor of IFF for $834,913 for its costs in the Plough action. He also awarded IFF $372,597.20 for costs incurred in the instant case.

Both parties appeal from Judge Pollack's decisions after the first trial. CU claims that IFF's breach of the policy's notice requirements vitiated all of CU's duties under the contract, including the duty to defend, while IFF argues that it was entitled to reimbursement for its settlement payment in the Plough action as well as its costs of defense. Both parties also appeal from the judgment entered after the second trial. CU claims that various errors were made at trial and that the damage awards to IFF were too high. IFF claims that the awards were too low.

## DISCUSSION

Notice-of-occurrence provisions have several purposes. *See generally* R. Keeton, *Insurance Law* 445–446 (1971). They enable insurers to make a timely investigation of relevant events and exercise early control over a claim. Early control may lead to a settlement before litigation and enable insurers to take steps to eliminate the risk of similar occurrences in the fu-

ture. When insurers have timely notice of relevant occurrences, they can establish more accurate renewal premiums and maintain adequate reserves.

Our dissenting colleague notes that the photoallergenic nature of 6–MC was totally unknown and unexpected prior to the events giving rise to the instant action. He also notes that Plough did its best in 1977 and 1978 to avoid any public disclosure that its Tropical Blend products might be harmful. However, we cannot agree with the suggestion that these facts excuse IFF from complying with the notice-of-occurrence provision as a matter of law. As noted above, a principal purpose of such a provision is to enable insurers to reduce future risks to the public by preventing the continued use of known harmful substances by their insureds. Had IFF given timely notice, CU could have taken steps to protect the public from further exposure to 6–MC. Indeed, Plough's attempts to avoid publicity were feasible *only* because IFF, which also had a financial interest in concealment, did not give notice to CU. We believe that a rule of law that would inhibit insurance companies from eliminating risks known to manufacturers and sellers but concealed for purposes of commercial advantage is undesirable.

Under New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy. *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 121 (2d Cir.1984); *Security Mut. Ins. Co. v. Acker-Fitzsimons Corp.*, 31 N.Y.2d 436, 440, 293 N.E.2d 76, 78, 340 N.Y.S.2d 902, 905 (1972). An insured's failure to give timely notice to its insurer may be excused, however, by proof that the insured either lacked knowledge of the occurrence or had a reasonable belief of nonliability. *Security Mut. Ins.*, 31 N.Y.2d at 441, 293 N.E.2d at 78–79, 340 N.Y.S.2d at 905–06. Viewing the evidence, as we must, in the light most favorable to CU, *Samuels v. Health and Hospitals Corp.*, 591 F.2d 195, 198 (2d Cir.1979), we conclude that it was more than sufficient to support the first jury's finding of an unex-

cused breach of the notice-of-occurrence provision.

The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim. *See, e.g., Utica Mut. Ins.*, 748 F.2d at 121–22 (citing *Security Mut. Ins.*, 31 N.Y.2d at 441–43, 293 N.E.2d at 78–90, 340 N.Y.S.2d at 906–07); *L'Italia Provisions Corp. v. Interboro Mut. Indemnity Ins. Co.*, 86 A.D.2d 888, 889, 447 N.Y.S.2d 335, 336 (App.Div.), *appeal denied*, 56 N.Y.2d 507, 438 N.E.2d 1147, 453 N.Y.S.2d 1025 (1982). By September 1977, some eighteen months before Plough began its litigation, IFF executives knew, *inter alia*, that: (1) 6–MC was photoallergenic; (2) Plough had contracted to pay IFF over $700,000 for a fragrance containing 6–MC; (3) Plough had spent thousands of dollars to determine the cause of the Tropical Blend problem; (4) millions of units of Tropical Blend could not be sold and would have to be destroyed; and (5) many individuals had suffered personal injuries, some severe, because of the fragrance. Subsequent events merely confirmed 6–MC's photoallergenicity. The fact that this harmful property was unknown prior to September 1977 is of no aid to IFF in view of its failure to give the required notice until March 1979. A jury might thus easily have concluded that a reasonable person, knowing in September 1977 that IFF's product had caused and was causing great losses to Plough, would have realized that there had been an occurrence possibly giving rise to a claim covered by the policy.

■ IFF contends that the first jury might have been misled by a portion of the court's charge implying that IFF was required to show that CU had acted in bad faith in denying coverage and defense.[3] After reviewing the entire charge, we are convinced that this argument fails. The district court's instruction with regard to IFF's obligation to give notice was eminently correct, and its marshaling of the facts strongly favored IFF. The portion of the charge to which IFF objects clearly related only to damages for the alleged wrongful failure to defend. The jury, however, denied damages for that and for the failure to indemnify as well. The verdict must have been based on the jury's conclusion that timely notice had not been given. The challenged instruction could not therefore have affected the verdict.[4]

■ After the first trial, Judge Pollack correctly held that IFF's breach of the notice-of-occurrence clause would relieve CU of its duty to indemnify IFF for Plough's recovery. He also concluded that this breach would not justify CU's refusal to defend the Plough lawsuit, however, because an insurer's duty to defend is broader than its duty to indemnify. *Commer-*

---

**3.** IFF objects to the following portion of the jury charge:

> The second and separate category of loss which IFF claims it suffered and seeks to recover on is the amount of the legal costs and expenses that IFF reasonably incurred and paid to defend itself in the Plough lawsuit by reason of the *failure and refusal of Commercial Union in alleged bad faith* to unconditionally defend IFF in that lawsuit in breach of its duty under the policies.
>
> An insurer who denies coverage does so at its own risk, and although its position may not have been entirely groundless, if the denial is found to be wrongful *and in bad faith*, it is liable for the full amount which will compensate the insured for all the damage caused by the insurer's breach of express and implied obligations of the contract.
>
> The proper measure of damages where *coverage has been in bad faith denied* is the amount which will compensate the party ag-

> grieved for all the detriment proximately caused thereby or which in the ordinary course of things would be likely to result therefrom.
>
> Once Commercial Union has been found liable by you for its failure and refusal *in bad faith* to defend [IFF] an award of the cost of defense is not an award of attorney's fees in the usual sense. Rather, it is compensation for the foreseeable consequences of the company's breach of contract. (emphasis added)

**4.** We note that although the district court later characterized as "cryptic" the jury's verdict that "IFF is not entitled to damages," *Commercial Union*, 633 F.Supp. at 649, the verdict was in complete compliance with the district court's express instruction that "you will report a general verdict for either IFF or Commercial Union," and "[i]f you find for IFF, you should also report the damages that you find, if any."

*cial Union,* 633 F.Supp. at 649. That was error. While an insurer's obligation to furnish a defense is indeed separate from and broader than its obligation to indemnify, *e.g., Seaboard Sur. Co. v. Gillette Co.,* 64 N.Y.2d 304, 310–11, 476 N.E.2d 272, 274–75, 486 N.Y.S.2d 873, 875–76 (1984); *Goldberg v. Lumber Mut. Casualty Ins. Co.,* 297 N.Y. 148, 154, 77 N.E.2d 131, 133 (1948), the added breadth arises out of the duty to provide a defense against even wholly frivolous, and thus non-indemnifiable, claims so long as the allegations fall within the policy's coverage. IFF's compliance with the notice requirement, however, was a condition precedent to all of CU's duties under the policy, including the duty to defend. *See e.g., Empire City Subway Co. v. Greater New York Mut. Ins. Co.,* 35 N.Y.2d 8, 315 N.E.2d 755, 358 N.Y.S.2d 691 (1974); *Security Mut. Ins.,* 31 N.Y.2d at 440, 293 N.E.2d at 78, 340 N.Y.S.2d at 905; *Phillips v. Transamerica Ins. Co.,* 107 Misc.2d 162, 167–68, 433 N.Y.S.2d 555, 558–59 (Sup.Ct.1980); 13A G. Couch, *Cough On Insurance 2d,* § 49:190 (rev. ed. 1982). The first jury's finding that IFF had not complied with the notice provision thus excused CU's refusal to defend without reservation as well as its refusal to indemnify.

The sole remaining question, therefore, is whether CU is precluded from enforcing the notice provision by its brief defense of the Plough action. IFF rests its argument in this regard on three theories, one based on an irrevocable election to undertake the defense of an action, the second on waiver, and the third on equitable estoppel.

IFF argues first that once an insurer elects to undertake the defense of an action, New York law precludes it from withdrawing for any reason. The sole support cited is *Sachs v. Maryland Casualty Co.,* 170 A.D. 494, 156 N.Y.S. 419 (App.Div. 1915). *Sachs* neither supports nor establishes that proposition, however. *Sachs* appears to have been decided at a time when the law was unclear as to whether the duty to defend extended to meritless claims. The precise holding in *Sachs* is that an insurer may not excuse its failure to defend an action on the ground that the insured ultimately won the case. *Sachs* thus has never been followed as a precedent for the proposition asserted by IFF, *see Cullinane v. Travelers Ins. Co.,* 26 N.Y.S.2d 933, 941–42 (City Ct.1940), and many New York cases recognize that an insurer may withdraw on various grounds after undertaking the defense of an action. *See, e.g., Spinosa v. Hartford Fire Ins. Co.,* 90 A.D.2d 574, 456 N.Y.S.2d 140 (App.Div. 1982); *Western World Ins. Co. v. Jean & Benny's Restaurant, Inc.,* 69 A.D.2d 260, 419 N.Y.S.2d 163 (App.Div.) (per curiam), *appeal dismissed,* 48 N.Y.2d 653, 396 N.E.2d 485, 421 N.Y.S.2d 202 (1979); *Greater New York Mut. Ins. Co. v. Powers,* 25 Misc.2d 393, 206 N.Y.S.2d 728 (Sup. Ct.1960); *General Accident, Fire and Life Assurance Corp., Ltd. v. Reggiani,* 2 Misc.2d 625, 152 N.Y.S.2d 680 (Sup.Ct. 1956).

Our resolution of the waiver and equitable estoppel arguments necessitates a discussion of the procedural context in which they arise. Prior to trial, both parties appear to have assumed that these issues were for the jury to determine. Indeed, both parties submitted requests to charge relevant to those issues. It is clear that waiver is a proper issue for the trier of fact, and New York courts have held that to be the case as to equitable estoppel also. *See Spinosa,* 90 A.D.2d at 576, 456 N.Y. S.2d at 142; *Ashland Window & Housecleaning Co. v. Metropolitan Casualty Ins. Co.,* 269 A.D. 31, 36, 53 N.Y.S.2d 677, 680 (App.Div.1945). Nevertheless, Judge Pollack's charge made no reference to either issue, thus giving to the jury only the question of IFF's compliance with the notice-of-occurrence provision. Neither party excepted to the failure to submit the waiver and equitable estoppel issues to the jury. After trial, however, IFF moved for judgment n.o.v. on the grounds, *inter alia,* that "AS A MATTER OF LAW, CU UNDERTOOK TO DEFEND IFF AND COULD NOT THEREAFTER RENEGE," and "AS A MATTER OF LAW, CU WAIVED ANY DEFENSE OF LATE NOTICE." Defendant's Memorandum in Support of Motion for Judgment Notwithstanding the Verdict

and New Trial at 12, 22 (capitalization in original). CU, in responding to the motion, did not argue that these issues had themselves been waived.

We have embarked on this tangent in order to clarify exactly what it is that we are asked to review. IFF makes no claim of error relating to the instructions to the jury in this regard. Rather, its claim is that on the evidence before the jury, CU's brief defense of the Plough action precluded it as a matter of law from reserving its rights or denying coverage for a breach of the notice-of-occurrence provision. Given this procedural posture, we must address the waiver and equitable estoppel issues as if they had been submitted to a properly instructed jury that resolved them against IFF. We must therefore view the facts in the light most favorable to CU. We turn now to those issues.

■ Waiver of a defense is proven by evidence that the insurer intended to abandon that defense. *Albert J. Schiff Associates, Inc. v. Flack,* 51 N.Y.2d 692, 698, 417 N.E.2d 84, 87, 435 N.Y.S.2d 972, 975 (1980). There is no evidence that CU ever intended to abandon a defense based on a violation of the notice-of-occurrence provision. In fact, about two weeks after undertaking the defense, CU expressly informed IFF that it had not yet confirmed coverage. A reasonable trier of fact might thus easily conclude that CU had not waived its rights.

■ IFF's final theory is based on equitable estoppel, a doctrine that limits an insurer's ability to delay coverage decisions after undertaking the defense of an action. It precludes the insurer from denying coverage if: (1) the period of time taken by the insurer to determine compliance is unreasonable under the circumstances, and (2) the defense offered by the insurer during that period prejudices the insured. *See, e.g., Tel-Tru Mfg. Co. v. North River Ins. Co.,* 90 A.D.2d 670, 671, 456 N.Y.S.2d 287, 288–89 (App.Div.1982); *Spinosa,* 90 A.D.2d at 575–76, 456 N.Y.S.2d at 141–42 (App. Div.1982); *Hartford Ins. Group v. Mello,*

81 A.D.2d 577, 578, 437 N.Y.S.2d 433, 434 (App.Div.1981); *Western World,* 69 A.D.2d at 263, 419 N.Y.S.2d at 165.

Judge Pollack's grant of judgment n.o.v. was apparently based on equitable estoppel. He stated that CU "belatedly" conceived that it might wish to assert untimely notice as a defense and "delay[ed]" its decision to disclaim. *Commercial Union,* 633 F.Supp. at 651. In that regard, he concluded that CU had not actually disclaimed coverage until July 1980. Under New York law, however, CU's letter of May 31, 1979, unambiguously stating its belief that IFF's notice of an occurrence was late and its intention to reserve its right to deny coverage, was a legally effective disclaimer. *See General Accident,* 2 Misc.2d at 625–26, 152 N.Y.S.2d at 681–82 (letter combining coverage denial with reservation of rights has effect of "disclaiming liability"). Indeed, IFF treated this letter as a denial of coverage by CU and proceeded to defend the Plough case through its own counsel.

We also reject the district court's conclusion that the facts recited in the Plough complaint alone gave CU sufficient knowledge in March 1979 to make an immediate decision as to coverage. *See Commercial Union,* 633 F.Supp. at 650. It is relatively obvious that an insurer is not entitled to rely on the allegations of a complaint filed against an insured as proof that a condition of the policy has not been met. It is also obvious that we would do neither insurers nor insureds any favor by compelling the former to make uninformed decisions as to whether insureds have complied with conditions precedent. Insurers should therefore be allowed a reasonable period of time to investigate questions of coverage while they undertake a defense. Given that CU's determination of whether IFF's notice was timely, required an investigation into exactly what particular IFF officials knew at various times, and given that the Plough litigation was hardly underway by May 31, 1979, a trier of fact could have found that the time CU took to decide was not unreasonable.[5]

---

**5.** IFF asserts that Judge Pollack erred in ruling that N.Y.Ins.Law § 167(8) (currently § 3420(d)

(McKinney 1985)) was inapplicable to this case. Under this statute, it is not necessary for an

The district court's decision to grant judgment n.o.v. was therefore error. Judge Pollack conditionally granted IFF's alternative motion for a new trial in the event the judgment n.o.v. was reversed or vacated. He did so on the ground that the jury verdict denying IFF reimbursement for its defense costs "was clearly against the weight of the credible evidence." *Commercial Union*, 633 F.Supp. at 654. Because we have concluded that there was more than ample evidence to support the determination that IFF breached the notice-of-occurrence clause, "no useful purpose could be served by submitting the same evidence to another jury." *O'Neil v. W.R. Grace & Co.*, 410 F.2d 908, 915 (5th Cir. 1969). We therefore reverse the conditional grant of a new trial and direct that judgment be entered on the original verdict. *See id.; Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 187–88 (8th Cir.1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973); Fed. R.Civ.P. 50(c)(1).

Because we hold that the jury verdict for CU should be reinstated in its entirety, we need not reach the issues arising out of the second trial.

Reversed and remanded with instructions to enter judgment for CU.

OAKES, Circuit Judge (dissenting):

The majority holds that IFF failed to give timely notice to Commercial Union of a relevant occurrence and thus Commercial Union had no duty to defend or indemnify IFF. Because I believe IFF satisfactorily complied with its obligation under the contract to notify Commercial Union of the suit brought by Plough, I respectfully dissent.

Under Paragraph 4 of the Commercial Union policies, IFF had duties as follows:

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

There is no doubt that IFF complied with subparagraph 4(b) relative to notification of the suit brought by Plough, and "Occurrence" is defined in the Commercial Union policies as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

In a malpractice insurance case, *Giles v. St. Paul Fire & Marine Insurance Co.*, 62 A.D.2d 1138, 404 N.Y.S.2d 190 (1978), the court described as "vague and ambiguous" language defining "occurrence" that was precisely the same as the language in this case. The court held that no notice was required by the insured until suit was brought, arguing that if the insurer "intended to require notice at the time the plaintiff insureds became aware of an act

---

insured to show prejudice caused by an insurer's unreasonable delay in disclaiming liability or denying coverage. *Allstate Ins. Co. v. Gross*, 27 N.Y.2d 263, 269, 265 N.E.2d 736, 739, 317

N.Y.S.2d 309, 313–14 (1970). The issue is irrelevant, however, in view of our holding as to the reasonableness of the time CU took to determine coverage.

or omission which might reasonably be expected to be the basis of a ... suit, it should have done so in clear and unambiguous language." *Id.* at 1139, 404 N.Y.S.2d at 192. That case was followed in *Romano v. St. Paul Fire & Marine Insurance Co.,* 65 A.D.2d 941, 410 N.Y.S.2d 942 (1978) (mem.); *but see id.* at 943, 410 N.Y.S.2d at 944 (Cardamone, J., dissenting). As I see it, products liability is analogous to malpractice liability in that, to use the language of *Giles,* "[t]he potential for error in a [products liability] context is pervasive." 62 A.D.2d at 1139, 404 N.Y.S.2d at 192. Because an ambiguous policy must be construed against the insurer, *see, e.g., Niagara County v. Utica Mut. Ins. Co.,* 80 A.D.2d 415, 420, 439 N.Y.S.2d 538, 541 (1981), and because this is a case where, quoting Judge Pollack in setting aside the first verdict, "a cause is unknown, disputed, investigated by scientists, only discovered by new methodology and unanticipated until long after the occurrences," 633 F.Supp. at 653, I believe that IFF had no duty to notify the insurer until Plough threatened suit. Plough did not threaten suit, however, it brought suit. Therefore there was no violation of the policy conditions.

To be sure, there is broad language in *Security Mutual Insurance Co. v. Acker-Fitzsimons Corp.,* 31 N.Y.2d 436, 440–41, 293 N.E.2d 76, 78, 340 N.Y.S.2d 902, 905–06 (1972), to the effect that the insured "must exercise reasonable care and diligence to keep himself informed of accidents out of which claims for damages may arise" and that an "insurer need not show prejudice before it can assert the defense of noncompliance" with a condition requiring notice of an occurrence. But that case involved insureds who knew that two firemen had been injured in a major fire at a building they owned and operated. Indeed, the insureds had read a newspaper article reporting that the firemen had filed suit against the city and specifically referring to the possible liability of the insureds.

Here I suggest that the ingredient 6–MC had been used for decades as a fragrance and flavoring agent without incident or complaint. Both as a discrete ingredient and as part of Plough's suncare products, it had been thoroughly tested and found to be without harmful propensity. Existing testing methodologies were not able to predict or demonstrate its photoallergenicity and the scientific community as a whole believed it harmless, as the scientific literature likewise indicated. Moreover, IFF had been requested by Plough to duplicate a fragrance provided by Plough which itself contained 6–MC, and Plough itself did not consider the alleged reactions to its products serious enough even to call for a warning to consumers, much less a recall of such products, until the FDA request in September 1978, a request which Plough resisted. I note that Plough had kept strictly confidential its meetings and correspondence in 1977 and 1978 with the FDA over a possible recall of Plough's products, and had urged the FDA to do likewise, on the ground that the problem was not serious enough to warrant publicity, let alone recall. It is interesting that after 6–MC had been identified as a photoallergen and replaced in IFF's fragrance, Plough continued to purchase the reformulated fragrance and other fragrances from IFF, without making any claim against IFF. And, Plough never made any claim against IFF or even indicated that it intended to do so until it brought suit in March 1979, three months after the FDA action. Finally, IFF in my opinion could reasonably have thought the manufacturer of the end product, that is, Plough, was responsible for the safety of that product, as the ultimate use of the fragrance was wholly within its control. Mr. Grisanti of IFF, who had twenty-five years' experience in the fragrance industry, testified that nobody in that industry had ever been sued as a result of an allergic reaction to a fragrance supplied to a cosmetics manufacturer.

Given these points, many of them stipulated to by CU, I do not think IFF violated the notice provision of the policy by failing to notify CU until Plough actually brought suit. Indeed, as early as December 8, 1978, IFF notified its insurance broker who in turn notified CU of the FDA's finding that 6–MC could cause allergic reactions in con-

sumers using products in which it was incorporated. That letter goes on to report that no claims or demands had been made against IFF as a result of its use of 6–MC.

Accordingly, I dissent.