**AMERICAN INSURANCE COMPANY, a Nebraska Corporation; and Associated Indemnity Corporation, a California Corporation, Plaintiffs–Counter–Defendants–Appellees,**

v.

**FAIRCHILD INDUSTRIES, INCORPORATED, a Delaware Corporation, Defendant–Counter–Claimant–Appellant.**

No. 813, Docket 94–7606.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1994.

Decided June 1, 1995.

Steven W. Phillips, Foley, Hoag & Eliot, Boston, MA (Leslie B. Bellas, John A. Shope, Foley, Hoag & Eliot, Boston, MA, of counsel), for defendant-counter-claimant-appellant.

K. Thomas Shahriari, Gilberg & Kurent, Washington, DC (Mitchell A. Stearn, Alan C. Nessman, Gilberg & Kurent, Washington, DC, of counsel), for plaintiffs-counter-defendants-appellees.

Frank M. Pell, Ainsworth, Sullivan, Albany, NY (Edward Zampino, Peter E. Mueller, Victor C. Harwood, III, of counsel), for amicus curiae Aetna Cas. and Sur. Co.

Thomas W. Brunner, John E. Barry, Cynthia L. Kendrick, Wiley, Rein & Fielding, Washington, DC, for amicus curiae Ins. Environmental Litigation Ass'n.

Before: KEARSE and WINTER, Circuit Judges, and CONNER, District Judge.*

* The Honorable William C. Conner, United States District Judge for the Southern District of New York, sitting by designation.

WINTER, Circuit Judge:

Plaintiffs-appellees are insurers whom the parties refer to collectively as "Fireman's Fund," as shall we. The defendant-appellant is their insured, Fairchild Industries, Incorporated ("Fairchild"), a Delaware Corporation that manufactured aircraft at a plant in Farmingdale, New York. This appeal involves a dispute over Fairchild's right to indemnification and costs of defense for remediation efforts necessitated by environmental contamination at two areas on the Farmingdale site. Judge Wexler directed a verdict for Fireman's Fund. We affirm on the ground that Fairchild's notice of claims was untimely as a matter of law.

## BACKGROUND

From 1950 until 1981, Fairchild and the previous owner of the Farmingdale facility, Republic Aviation Company ("Republic"), discharged treated industrial wastewater into a 13-acre basin located near the main manufacturing facility. A second area of contamination was a storage tank at the site that developed an apparently slow leak resulting in an underground plume of perchloroethylene ("PCE").

In 1983, the New York State Department of Environmental Conservation ("NYSDEC") began investigating the Farmingdale site. The investigation commenced with a letter to Fairchild alluding to potential liability and warning that Fairchild could be liable for cleanup costs under either N.Y. Environmental Conservation Law § 27–1313 or the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq. The letter stated that it "constitute[d] a claim by the State of New York" under CERCLA. However, the letter did not specify any particular remedial action or detail the extent of Fairchild's exposure to liability.

Thereafter, Fairchild and the NYSDEC engaged in ongoing negotiations in which the agency took an increasingly serious view of pollution resulting from sediments in the basin. In 1985, a letter from the NYSDEC to Fairchild stated that, based on "existing information" regarding the basin, "investigation and remediation efforts are required." Meanwhile, Fairchild retained the consulting firm of Geraghty & Miller to study the Farmingdale site. In December 1985, the consultants produced a report on the environmental problems associated with the basin. This report was given to NYSDEC for examination. In 1986, Fairchild entered into a consent order with the NYSDEC indicating that the agency believed that the basin constituted "a significant threat to the environment" and that a remediation plan might be required. In 1987, Geraghty & Miller sent a memo to Fairchild outlining the consultants' views as to viable options in negotiating with NYSDEC. In that memo, Geraghty & Miller advised Fairchild that it might be "impossible" to show that the sediments in the basin were non-hazardous.

The PCE plume was not discovered until 1988, at which time the full extent of the contamination from that source was not known.

In early June 1988, Fairchild officials, its counsel, and consultants met with the NYSDEC regarding both the basin and the PCE plume. An internal Fairchild summary of the meeting states: "[The basin and plume] will most likely be reclassified from Class 2A to Class 2 as a result of the findings of the Phase II investigation. This means that remedial action will be required at both sites."

In August and September 1989, the NYSDEC officially reclassified the Farmingdale site as a Class 2 site, an "Inactive Hazardous Waste Site" requiring remediation. The reclassification was based upon the sediment in the discharge basin and the 6,500 foot PCE plume. In September 1989, Fairchild notified Firemen's Fund of the existence of a claim against it.

The insurance contracts at issue were in effect between 1965 and 1982 and required notice to the insurer of "occurrences" or "claims." The pertinent provisions regarding such notices are set out in the margin.[1]

---

**1.** Insured's Duties in the Event of Occurrence, Claim or Suit:

(a) In the event of an occurrence, written notice containing particulars sufficient to identify

The two policies purchased for 1977 and 1978 also contained a clause providing that the insured's failure to comply with a notice provision would not bar liability unless the insurer was prejudiced by such failure.

As noted, two distinct forms of notice were contemplated. A notice of occurrence was to be given "as soon as practicable" when the insurance manager became aware of an event that a reasonable person might believe would give rise to a liability covered by the policy. A notice of claim was to be given "immediately" upon any entity making a claim upon Fairchild for which the insurer might be responsible.

In August 1991, Fireman's Fund brought a suit in the Eastern District of New York seeking a declaratory judgment that it was under no obligation to defend or indemnify Fairchild for any environmentally related liability at five sites located throughout the United States. The parties settled the disputes involving four of the five sites but could not resolve the issues pertaining to Farmingdale.

The parties proceeded to try the Farmingdale case to a jury. Four days into the trial, Judge Wexler *sua sponte* directed a verdict against Fairchild on all claims. In a written memorandum, the district court grounded its decision on two theories that need not be examined in detail given our disposition of this matter. Fairchild then brought this appeal.

## DISCUSSION

We hold that Fairchild's notice of claim was untimely as a matter of law with respect to both the discharge basin and the PCE plume.

This is a diversity case in which the parties agree that New York law applies. Under that law, compliance with the notice provisions of an insurance contract is a condition precedent to an insurer's liability. *See Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.,* 822 F.2d 267, 271 (2d Cir.1987). If an insured fails to provide timely notice as required by the particular policy, then, absent a valid reason for the delay, the insurer is under no obligation to defend or indemnify the insured. *See, e.g., Allcity Ins. Co. v. Jimenez,* 78 N.Y.2d 1054, 1055, 576 N.Y.S.2d 87, 88, 581 N.E.2d 1342, 1343 (1991). The burden is on the insured to show that a delay was reasonable under the circumstances. *Security Mut. Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 441, 340 N.Y.S.2d 902, 904–06, 293 N.E.2d 76, 78–79 (1972).

### A. Notice of Claim Regarding the Discharge Basin

Fireman's Fund argues that a "claim" regarding the discharge basin was made upon Fairchild by the 1983 letter from the NYSDEC, noting that the letter repeatedly uses the word "claim." Fairchild responds that a "claim" must make a relatively particularized request or demand, which was lacking in the initial communications from the NYSDEC. Fairchild argues that no "claim" was made until the reclassification of the Farmingdale site in 1989.

the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the Company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

Definition of "occurrence":

"[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

We first address the meaning of "claim." Unlike the term "occurrence," which leaves room for differences of opinion as to whether a particular event is likely to lead to liability under the relevant policy, the term "claim" would not seem to be a fertile ground for disputes. Giving the term its ordinary meaning, a claim is an assertion by a third party that in the opinion of that party the insured may be liable to it for damages within the risks covered by the policy. It "must relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer." *Evanston Ins. Co. v. GAB Business Servs., Inc.*, 132 A.D.2d 180, 185, 521 N.Y.S.2d 692, 695 (1st Dep't 1987) (interpreting a standard "claim" provision). A claim may be made without the institution of a formal proceeding. Indeed, the pertinent provisions of the policies at issue distinguish between "a claim" and "a suit." A third person's assertion of liability is a claim, moreover, whether or not there is a reason to believe that there actually is liability. Unless the assertion is made in circumstances so unusual that they negate the possibility of a formal proceeding involving defense costs as well as liability, virtually any assertion of an exposure to liability within the risks covered by an insurance policy is a claim.

We have thus previously indicated that a notice of occurrence requirement is treated differently under New York law from a notice of claim requirement. *See New York v. Blank*, 27 F.3d 783, 795–96 (2d Cir. 1994). In the case of the former, the insured's knowledge of events that create only a very distant possibility of a claim may not trigger a notice of occurrence provision so long as the insured has a good faith and reasonable belief that no liability covered by the policy will result. *Id.* at 795. A notice of occurrence provision thus focuses on the insured's knowledge of events and reasonable conclusions based on that knowledge. *See*

*Christiania Gen. Ins. Corp. v. Great American Ins. Co.*, 979 F.2d 268, 275–76 (2d Cir. 1992); *Blank*, 27 F.3d at 795–96. As we noted in *Blank*, "if insureds were required to notify insurers of every incident that poses even a remote possibility of liability, insurers would soon be swamped with notice of minor incidents that pose little danger [of liability]." *Blank*, 27 F.3d at 795.

A notice of claim provision, however, focuses on the actions of third parties and may be triggered by an unreasonable—even sanctionable—assertion of liability.[2] We have thus noted that one harm caused by vexatious litigants who bring baseless lawsuits against lawyers is the need of those lawyers to notify their insurance carriers. *See In re Martin–Trigona*, 737 F.2d 1254, 1262 (2d Cir.1984). An assertion of possible liability, no matter how baseless, is therefore all that is needed to trigger a notice of claim provision.

A powerful argument can thus be made that the 1983 letter from NYSDEC to Fairchild, which stated that Fairchild "may be liable for the present and future costs of response, removal and remediation ... around the referenced site," was a claim regarding the discharge basin within the notice provision of the relevant policies. Fairchild argues that the letter was not sufficiently specific as to harm, location, or liability to constitute a claim. Arguably, however, an insurance company would want the opportunity to play a role in whatever proceedings might follow. Had Fairchild received a letter from a lawyer stating that he or she represented a client who had been injured in an auto accident with a Fairchild vehicle and believed Fairchild liable for resultant injuries, notice to the insurer would not be excused because of the lack of specificity. *See Boyer v. American Casualty Co.*, 332 F.2d 708, 710 (2d Cir.1964).

---

**2.** *Town of Smithtown v. National Union Fire Insurance Co.*, 191 A.D.2d 426, 594 N.Y.S.2d 318 (2d Dep't 1993), has language to the effect that a good faith belief of nonliability may excuse an untimely notice of claim. However, the cases it cites are notice of occurrence cases. Moreover, the pertinent provision of the policy quoted in *Smithtown* uses the language "as soon as practi-

cable," which is part of the standard notice of occurrence clause. *See* Note 1, *supra*. Finally, the decision holds only that a failure to give notice that the Town had violated a tax statute was excused because of a good faith belief in nonliability. The statutory violation was of course an occurrence, not a claim.

However, as a federal court applying state law, we are reluctant to hold that the 1983 letter was a claim because no New York case has as of yet addressed that precise issue. Moreover, we need not determine whether the 1983 letter was a claim under the notice provisions. The ongoing negotiations between Fairchild and the NYSDEC made it clear long before notice was actually given in 1989 that NYSDEC was specifically seeking to compel Fairchild to undertake efforts to remediate the sediment in the discharge basin. For example, in 1985, the NYSDEC informed Fairchild that "based on existing information" concerning the basin, "investigation and remediation efforts are required." That was a claim even under a narrow—even unreasonably narrow—interpretation of the term.

To be sure, Fairchild conducted last ditch efforts to avoid remediation, but it cannot be seriously maintained that no claim within the meaning of the policies was made until the official reclassification in 1989. The NYSDEC had for a considerable period of time been clearly warning that remediation efforts regarding the basin seemed necessary, although it allowed Fairchild time and opportunity to demonstrate otherwise. However, the forgoing of a demand for immediate remediation does not undermine our conclusion that the NYSDEC had informed Fairchild of its belief in the need for remediation long before notice was given in September 1989. The 1989 reclassification was thus more analogous to the adjudication of liability than to the assertion of a claim.

■ We turn next to the reasonableness of Fairchild's delay in notifying the insurer and quickly conclude that it was unreasonable as a matter of law. In the instant case, the delay was at a minimum over three years. Under New York law, delays for one or two months are routinely held "unreasonable." See American Home Assurance Co. v. Republic Ins. Co., 984 F.2d 76, 78 (2d Cir.) (collecting New York cases), cert. denied, — U.S. —, 113 S.Ct. 2964, 125 L.Ed.2d 664 (1993); see also Deso v. London & Lancashire Indem. Co., 3 N.Y.2d 127, 130, 164 N.Y.S.2d 689, 691, 143 N.E.2d 889, 891 (1957)

(holding delay of 51 days to be unreasonable).

■ The lack of notice of a claim thus relieves Fireman's Fund of any obligation under most of the insurance policies at issue. See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos., 748 F.2d 118, 121 (2d Cir.1984) ("New York law permits an insurance company to assert the defense of non-compliance without showing that the lack of timely notice prejudiced the insurer in any way."). As noted, however, the 1977 and 1978 policies required a showing of prejudice from late notice. Nevertheless, we conclude that Fireman's Fund has demonstrated prejudice from lack of notice of NYSDEC's claim concerning the discharge basin. As happened here, environmental disputes may spark negotiations that determine the final costs of a clean-up. Without notice of a claim that leads to such negotiations, the insurer is excluded from the negotiating process. In addition, the passage of time renders it difficult to reconstruct relevant events—equipment ages, records vanish, and memories fade. In the instant case, negotiations and studies concerning the discharge basin were ongoing for years without Fireman's Fund's participation. For example, in 1987 Geraghty & Miller prepared a memo listing "options" to be pursued with NYSDEC regarding the basin. Clearly, the failure to notify Fireman's Fund of the consideration of these options deprived it of the opportunity to participate with an eye to reducing the ultimate costs of remediation. At the end of years of negotiations about which it had no notice, Fireman's Fund was presented with a virtual fait accompli.

We conclude that the very deprivation of an opportunity to play a meaningful role in the studies and negotiations that determine the amount for which indemnification is sought is substantial prejudice to an insurer. Cf. Blank, 27 F.3d at 796 ("The opportunity to conduct ... investigation and research is the very reason for the notification requirement."). An insurer cannot be expected to show precisely what the outcome would have been had timely notice been given. This uncertainty, however, is the result of the failure of the insured to comply with the

policy, and it should not be permitted to use that uncertainty as a weapon against the insurer.

### B. *Notice with Respect to the PCE Plume*

 We also hold that the notice of claim was untimely with respect to the PCE plume discovered in 1988. Fairchild points out that, prior to 1988, traces of PCE had been discovered at a different location on the Farmingdale site and that this earlier discovery had not led to costly remediation efforts. Fairchild reasons from this that the mere discovery of trace amounts of a "hazardous substance" cannot implicate notice of claim provisions.

Fairchild's position may (or may well not) have merit regarding a notice of occurrence, but it has no application in the instant matter. Fairchild and the NYSDEC were negotiating over remediation of the PCE plume long before Fairchild gave notice in late 1989. The internal Fairchild memorandum of June 15, 1988 indicated that Fairchild knew at that time that a relatively significant amount of PCE had leaked. The memorandum suggested an investigation to "provide a complete or nearly complete definition of the [PCE] plume" and also referred to the importance of obtaining a delisting of the plant areas "outside the problem area (plume)" so that the delisted areas could be "regarded as ordinary real estate." Clearly, Fairchild had at this time no expectation that the plume area could be delisted. Even more tellingly, the June 7, 1988 internal memorandum indicates that the NYSDEC told Fairchild on June 2, 1988, that the plume area—along with the discharge basin—would "most likely" be reclassified as Class 2 from Class 2A and thus "that remedial action will be required at both sites." Fairchild thus knew at this time that NYSDEC was asserting its liability for remediation of the plume area. That assertion was a claim requiring notice to Fireman's Fund.

Although it was clear by June 1988 that the NYSDEC was likely to compel remediation efforts to clean up the PCE plume, notice was not given to Fireman's Fund until September 1989, when reclassification was finally ordered. This delay of over one year was unreasonable as a matter of law. *See, e.g., American Home Assurance,* 984 F.2d at 78 (collecting New York cases).

 Although the question of whether Fireman's Fund suffered prejudice (with regard to the 1977 and 1978 policies) is less clear cut with respect to the PCE plume than with respect to the basin, the basic analysis remains the same. By not giving Fireman's Fund notice before its negotiations with NYSDEC, Fairchild ensured that Fireman's Fund did not participate in either the investigation of the plume or negotiations over a remedy. Given that: (i) the investigation was relevant to Fairchild's claim that the plume fell within the "sudden and accidental" exception to the policy exclusion for environmental liability and (ii) the negotiations with NYSDEC determined the ultimate cost of remediation, Fireman's Fund was, for reasons stated above with regard to the basin, prejudiced by the late notice of claim.

### CONCLUSION

We therefore affirm the district court's directed verdict for plaintiffs on all claims.