The AMERICAN INSURANCE COMPANY, a Nebraska Corporation, and Associated Indemnity Corporation, a California Corporation, Plaintiffs,

v.

FAIRCHILD INDUSTRIES, INC., Defendant.

No. CV 91–2934.

United States District Court, E.D. New York.

May 18, 1994.

Gilberg & Kurent by K. Thomas Shahriari, Washington, DC, for plaintiffs.

Foley, Hoag & Eliot by Steven W. Phillips, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

The American Insurance Company ("Fireman's Fund") brought this action seeking a declaration that it has no duty to defend or indemnify Fairchild Industries, Inc. ("Fairchild") for the investigation and potential remediation costs associated with the clean-up of a site in Farmingdale, Long Island. Fairchild, in turn, counterclaimed for a declaration that Fireman's Fund has both the duty to defend and the duty to indemnify it for these costs. On April 11, 1994, the case went to trial. After both sides presented all their evidence bearing on Fireman's Fund's obligations under the relevant policies, this Court entered judgment as a matter of law in favor of Fireman's Fund. This opinion follows.

## I. BACKGROUND

In August 1989, the New York State Department of Environmental Conservation ("NYSDEC") officially classified two areas of Fairchild's plant as an Inactive Hazardous Waste Site, Class 2. General Stipulation ("Gen.Stip.") ¶ 13. An Inactive Hazardous Waste Site is defined by the state as posing a "significant threat to the public health or environment—action required." Gen.Stip. at ¶ 14. On September 15, 1989, Fairchild directed its insurance broker to notify its insurance companies, including Fireman's Fund, of the state's action. Gen.Stip. ¶ 15. On September 29, 1989, the broker sent Fairchild's notice letter to Fireman's Fund. Gen. Stip. ¶ 16. Subsequently, Fireman's Fund notified Fairchild that it would not defend or indemnify Fairchild for any of the costs incurred with respect to the investigation or clean-up of these two locations.

In August 1965, Fairchild Hiller Corporation purchased the assets and ongoing business of the Republic Aviation Corporation, including an aircraft manufacturing and assembly plant located on approximately 88 acres of land in Farmingdale, New York. Fairchild is the successor corporation to Fairchild Hiller Corporation. Fairchild, as successor to Fairchild Hiller, has standing to assert claims under all insurance policies that may exist. Insurance Stipulation ("Ins. Stip.") ¶ 1.

From 1965 through 1981, Fairchild discharged treated wastewater by permit into a sand-bottomed 13–acre recharge basin (the "Old Recharge Basin" or the "sump"). The

Old Recharge Basin was designed to recharge or percolate treated water back into the groundwater and also received discharges from other sources, including the State of New York. The discharge permits allowed specified substances, including chromium, to be discharged into the sump within limits established by the permits. Fairchild, on occasion, exceeded the limits prescribed by the permits. NYSDEC classified the Old Recharge Basin as an Inactive Hazardous Waste Site, Class 2, due to concentrations of chrome in the basin sediment. Gen.Stip. ¶ 30.

In addition, the site contained 15 aboveground storage tanks and 75 underground storage tanks. These tanks held a variety of substances including fuel oil, diesel, jet fuel, gasoline, waste oil and solvents. In 1975, Fairchild began work under a contract with the Air Force which required it to use a solvent called perchloroethylene ("Perc"). Gen.Stip. ¶ 5. The Perc was stored in an underground storage tank. The tank used to store the Perc was installed new in 1971. Between 1971 and 1975, the tank was used to store a solvent called Tolusol. Gen Stip. ¶ 7. Thereafter, Perc was stored in the tank.

In 1988, a monitoring well set up on the site indicated that Perc had migrated into the groundwater. Subsequent testing revealed the existence of a 6,500 foot Perc plume on the site.[1] The plume contains approximately 4,000 gallons of Perc. The Perc tank had a 3,000 gallon capacity. Both parties agree that sometime in 1975, shortly after Perc was introduced into the site, a leak developed somewhere in the delivery system. Both parties further agree that only about a gallon of Perc escaped a day. Tr. at 229, 305. Neither party, however, has been able to pinpoint with any certainty the exact source of the leak.

Fireman's Fund's expert testified that the most likely cause of the leak was corrosion in either the tank itself or in the piping leading to the tank. Tr. at 230. Fairchild's expert testified that he did not believe that the tank suffered from corrosion.[2] Rather, he opined that the source of the leak could be traced to certain underground pipe fittings. He believes that the fittings may have sprung a leak as a result of underground thermal fluctuations.

Fireman's Fund admits that it provided comprehensive general liability insurance to Fairchild from 1965 through 1982. Additionally, for the period 1968–1982, the parties are in substantial agreement regarding the terms of the policies in effect. Although Fireman's Fund concedes that it provided coverage between 1965–1968, the policies cannot be found and the parties do not agree on the terms of the missing policies.

The parties agree that the policies at issue contain two provisions that are especially relevant to the resolution of this case. First, the policies, including the missing policies, contain a notice of occurrence provision.[3] Second, both parties agree that all the policies issued after 1972 contain a pollution

---

**1.** A plume is an underground stream of pollutants that moves with the groundwater.

**2.** There is conflicting testimony with respect to the Perc tank's condition at the time of its removal. Mr. Nanos, a Suffolk County employee present at the site at the time of removal testified that he remembered that the tank was obviously and seriously corroded when it was removed. A contemporaneous report filed by the County at that time, however, indicated that the tank was not corroded.

**3.** The relevant provision states:

In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the Company or of any of its authorized agents as soon as practicable.
If claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.
Additionally, the policies also contain the following amendment to the Notice of Occurrence provision:
It is agreed that notice in the event of an occurrence as defined herein to be given by or for the insured to the Company shall mean as soon as practicable after knowledge of such occurrence is known to the Insurance manager of the Corporation.

exclusion clause.[4] Fireman's Fund argues that it has no duty to defend or indemnify Fairchild for any claims arising out of the Old Recharge Basin because 1) Fairchild violated the notice of occurrence provision of the policies, and 2) the release of chrome into the sump was not "sudden and accidental" within the meaning of the policies. Additionally, Fireman's Fund claims that it has no duty to defend or indemnify Fairchild for the Perc plume because the plume was not caused by a "sudden and accidental" release as required by the policies. Because this Court agrees with Fireman's Fund it directed a verdict in its favor.

Like most major industrial sites involved in processes that produce or use hazardous materials, Fairchild's Farmingdale facility was subject to overlapping regulatory oversight by federal, state and local agencies. As a result, over a period of years, a variety of agencies investigated the facility and corresponded with Fairchild regarding the environmental consequences of its activities.

Beginning in 1981, various government agencies informed Fairchild that there was a potential problem with the sump. On September 16, 1981, the Suffolk County Department of Health Services ("SCDHS") sent a letter to Fairchild indicating that it had "discovered organic contamination of the above mentioned sump and of water discharged through the storm drain system on your property." Pl.Exh. 75. This letter instructed Fairchild that "[t]he entire sump must also be scraped or dredged. Disposal of spoils depends upon the nature of any contamination found." *Id.* On August 3, 1982, Fairchild entered into a consent order with SCDHS. Pl.Exh. 58. Fairchild agreed, among other things, to cease discharging wastewater into the Old Recharge Basin, to identify the extent of contamination and to propose a plan for clean-up of the sump if necessary. *Id.* Moreover, despite the consent order, SCDHS explicitly reserved its right to take further appropriate action with respect to the sump.

Subsequently, on December 6, 1983, NYSDEC notified Fairchild that it was potentially a responsible party under CERCLA "for the release or threatened release of hazardous substances...." Pl.Exh. 137. On February 20, 1985, as a follow-up to certain Fairchild correspondence, NYSDEC confirmed that Fairchild would "evaluate the impacts of past discharges/spills which have occurred at your Farmingdale facility." Pl.Exh. 193. The letter explained that Fairchild's "investigation and remediation efforts are required because existing information suggests that hazardous wastes are present in the lagoon [*i.e.*, the Old Recharge Basin] as the result of the past practices of Fairchild Republic Company." *Id.* NYSDEC further indicated that "[t]he concentrations of heavy metals in the sludge in the lagoon strongly suggest that this waste would be classified as a D type hazardous waste." *Id.*

On October 13, 1986, Thomas Webb ("Webb"), Fairchild's Chief Environmental Engineer, wrote an internal memorandum to George Assmus ("Assmus"), Fairchild's Farmingdale Facility Director, updating Assmus on all environmental projects at the facility, including the Old Recharge Basin rehabilitation. Pl.Exh. 47. In that memorandum, Webb estimated that if the state required Fairchild to remove bottom sediments from the sump, the cost would run anywhere from 11 to 15 million dollars. Webb also indicated that Fairchild would "do everything possible to avoid this requirement." *Id.*

Additionally, on May 4, 1987, Geraghty & Miller ("G & M"), Fairchild's environmental consultants, submitted a proposal for preparation of a closure plan for the sump. Pl.Exh. 62. In that proposal, G & M recapped three closure options. The first option, and the one suggested by Fairchild itself, was to convince NYSDEC that the bottom sediments were not hazardous and therefor could

---

**4.** The pollution exclusion at issue excludes: property damage arising out of the discharge, dispersal release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental* (emphasis added).

be safely left in the sump. G & M indicated that this option was untenable because "it may be impossible to demonstrate the non-hazardous nature of the sediments." *Id.*

The second option, which is the most expensive one, and the one G & M felt NYSDEC favored, was to remove the bottom sediments and transport them off-site. *Id.* The third option was to acknowledge that the bottom sediments were hazardous, but to show that the hazardous constituents have not and will not migrate from the site. According to G & M, if Fairchild could show that the hazardous materials have not migrated "it is not unreasonable to 'close' the facility as a hazardous materials disposal site with the 'waste' in place, recognizing the need for long-term ground water monitoring and a provision to implement a remedial program if migration is detected in the future." *Id.* On July 10, 1987, G & M sent a follow-up letter to Fairchild indicating, among other things, that the sump closure could generate a credit for Fairchild of 1.8 million dollars to a cost of 45 million dollars depending on the option chosen.[5] Pl.Exh. 63.

Finally, on June 2, 1988, a meeting was held at NYSDEC headquarters to discuss NYSDEC's response to Fairchild's Phase II reports.[6] A Fairchild internal memorandum dated June 7, 1988, memorialized the meeting. Pl.Exh. 3. At that meeting, NYSDEC indicated that the Old Recharge Basin "will most likely be reclassified from Class 2A[7] to Class 2 as a result of the findings of the Phase II Investigation." *Id.* (footnote added). As noted earlier, in August 1989, NYSDEC officially classified the sump as a Class 2 site requiring remediation.

## II. DISCUSSION

### A. Standard For Directing A Verdict

Under Rule 50(a) of the Federal Rules of Civil Procedure, a court may enter a judgment as a matter of law if "a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue. . . ." Because this case presents no issue of material fact requiring resolution by a jury, this Court entered a judgment as a matter of law in favor of Fireman's Fund.

### B. Fireman's Fund Has No Duty To Defend Or Indemnify Fairchild For Remediation Of The Old Recharge Basin Because Fairchild Failed To Give Timely Notice

■ It is undisputed that Fairchild gave notice to Fireman's Fund on September 29, 1989. It is also undisputed that the policies at issue contain a notice of occurrence provision. Fireman's Fund argues that as early as 1981, Fairchild was put on notice that it would be required to remediate the Old Recharge Basin. Accordingly, it is Fireman's Fund's position that it was entitled to notice shortly thereafter. Fairchild argues, however, that it was NYSDEC's 1989 reclassifica-

---

**5.** The 1.8 million dollar credit would be generated, according to G & M, if Fairchild was successful in convincing NYSDEC that the sediment in the sump was not hazardous and further if NYSDEC allowed Fairchild to fill the sump with 75% clean construction debris and 25% clean backfill. If on the other hand, Fairchild was compelled to dredge the sump, remove the sediment and fill it with 100% clean backfill, G & M estimated that the cost would be somewhere around 45 million dollars.

**6.** New York State's Environmental Conservation Law requires NYSDEC to compile a registry of known or suspected inactive hazardous waste sites. A "Phase I" investigation of all suspected sites is required, including a preliminary characterization of hazardous substances at each site, possible pathways by which pollutants could migrate and a description of how the site was used.

Upon completion of the Phase I investigation, NYSDEC may require an additional response to address discovered contamination. Where additional information beyond that contained in Phase I is needed to determine whether a site poses significant environmental risk, the state will conduct or permit the site owner/operator to conduct a "Phase II" investigation. Phase I investigations were done for every major industrial complex in the state. In 1983, a Phase I investigation of the Farmingdale site was conducted. In 1986, at the state's bequest, Fairchild initiated a Phase II investigation, which eventually led to the site's classification as a Class 2 hazardous waste site.

**7.** Class 2A is a temporary classification assigned to sites that have inadequate and/or insufficient data for inclusion in any of the other classifications.

tion of the site to a Class 2 site that triggered its obligation to notify its insurance carriers. " 'Under New York law, compliance with a notice of occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy.' " *Olin Corp. v. Insurance Co. of North America*, 743 F.Supp. 1044, 1052 (S.D.N.Y.1990) (quoting *Commercial Union Ins. Co. v. International Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir.1987). This is so even if the insurance company is not prejudiced by the delay. *Utica Mutual Ins. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 121 (2d Cir. 1984).

■ In order to determine whether a late notice defense is meritorious, a court must determine when the obligation to give notice accrued. In New York, notice must be given when " 'the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim.' " *Olin*, 743 F.Supp. at 1052 (quoting *Commercial Union*, 822 F.2d at 272). The New York test is an objective one, asking what an insured " 'reasonably could or should have concluded.' " *Olin*, 743 F.Supp. at 1052 (quoting *Utica Mutual*, 748 F.2d at 122).

■ Once the court determines when the obligation to give notice accrued, it must then decide whether the insured did provide timely notice. The insurance policies at issue in this case require that Fairchild give notice "as soon as practicable." New York courts interpret this provision as requiring notice "within a reasonable time under all the circumstances." *Olin*, 743 F.Supp. at 1052. Moreover, "[w]hile the reasonableness of delay may be an issue for trial, in the absence of an excuse or mitigating factors, courts have addressed that question as a legal matter." *Id.* Indeed, "[e]ven short periods of delay have been found unreasonable as a matter if law." *Id.; see also Commercial Union*, 822 F.2d at 272 (18 months); *Utica Mutual*, 748 F.2d at 121 (six months); *Government Employees Ins. Co. v. Elman*, 40 A.D.2d 994, 338 N.Y.S.2d 666 (2nd Dep't 1972) (29 days); *Peerless Ins. Co. v. Nationwide Ins. Co.*, 12 A.D.2d 602, 208 N.Y.S.2d

469, 470 (1st Dep't 1960) (four to five months); *Deso v. London & Lancashire Indem. Co.*, 3 N.Y.2d 127, 164 N.Y.S.2d 689, 692, 143 N.E.2d 889, 891 (Ct.App.1957) (51 days).

A review of the correspondence between the various government agencies and Fairchild supports a finding that Fireman's Fund was entitled to notification before September 1989. Beginning in 1981, SCDHS informed Fairchild that it would have to remediate the sump, including dredging and scraping the entire sump.[8] Although it is true that Suffolk County ultimately did not require this response from Fairchild, at the time Fairchild received this correspondence it had no way of knowing that the County would not follow through on its request.

Moreover, in 1985, Fairchild was once again alerted to the possibility that it would have to remediate the sump. On that date, NYSDEC informed Fairchild that the chrome-laden sediment was a hazardous substance and would have to be dealt with. Despite an internal Fairchild memorandum indicating that it would cost the company anywhere between 11 to 15 million dollars to dredge the basin, Fairchild did not notify Fireman's Fund.

Additionally, on May 4, 1987, Fairchild's own engineers reported that they believed the state would insist that Fairchild dredge the sump. Indeed, even the option promoted by Fairchild's own engineers would have required Fairchild to expend considerable sums of money to ensure that the basin remain safe. Moreover, that plan recognized that there would be a continuing risk that further remedial action may be required at the sump. Again, despite this report, Fairchild failed to notify its insurance carriers of the problem. Finally, on June 2, 1988, a meeting was held wherein Fairchild learned that the Old Recharge Basin would "most likely" be reclassified to a Class 2 site. As noted earlier, a Class 2 classification means that remediation is definitely required. Even after this meeting, no notification was sent to Fireman's Fund.

---

8. It appears from the consent order that SCDHS was concerned about organic compounds in the

Old Recharge Basin as opposed to the chrome content of the sediment.

■ As stated above, under New York law, the obligation to give notice accrues when " 'the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim.' " *Olin*, 743 F.Supp. at 1052 (quoting *Commercial Union*, 822 F.2d at 272). Fireman's Fund urges this Court to hold that as early as 1981, Fairchild was presented with information that should have apprised it of the possibility that some government agency would bring a claim against it with respect to the Old Recharge Basin. This is so, according to Fireman's Fund, even though the agency that initially alerted Fairchild of the need for remediation never followed through with its demand.[9] Fairchild, the argument goes, was or should have been aware that local, state and federal agencies exercised overlapping jurisdiction over the sump. The mere fact that it was NYSDEC, and not SCDHS, that finally required the action for which Fairchild is seeking indemnification does not, according to Fireman's Fund, erase the early warning Fairchild received from the SCDHS. Because SCDHS's concern with the sump was unrelated to NYSDEC's concern, this Court does not find that the SCDHS correspondence triggered Fairchild's obligation to give notice.

■ However, the SCDHS correspondence indicating that dredging would be required does not stand alone. Rather, this correspondence is bolstered by the 1985 NYSDEC letter indicating that some remediation was necessary, the internal memorandum suggesting that the requested remediation could run into the millions of dollars,[10] the engineering report indicating that the state would choose the most expensive remediation option, and the 1988 meeting suggesting that the state was most likely going to classify the Old Recharge Basin as a Class 2 site.

Standing against all these early indications that remediation was necessary, Fairchild's argument that its obligation to notify Fireman's Fund did not accrue until it got the official word that the sump was reclassified to a Class 2 site does not withstand scrutiny. This Court finds that a reasonable person should have known that there was a possibility of a claim as early as 1985, long before the state issued its final reclassification.[11] Notice, however, was not given to Fireman's Fund until 1989. Because there are no mitigating circumstances explaining this four year gap, this Court finds that as a matter of law Fairchild violated the notice of occurrence provision thereby relieving Fireman's Fund of its duty to defend and indemnify Fairchild.[12]

C. *Fireman's Fund Has No Duty To Defend Or Indemnify Fairchild For Remediation Of The Old Recharge Basin Because The Discharge Of Chrome Into The Basin Was Not Accidental*

■ Even had Fairchild provided timely notice to Fireman's Fund, it still would not be entitled to indemnification because the

9. SCDHS entered into a consent judgment with Fairchild. This agreement required Fairchild to close the Old Recharge Basin but did not require that Fairchild dredge it. Under the terms of the agreement, however, SCDHS reserved its rights to demand further appropriate remedial action from Fairchild. Fairchild is not seeking any funds from Fireman's Fund to cover the costs it incurred in responding to the SCDHS directives.

10. " 'Notice of occurrence provisions ... enable insurers to make a timely investigation of relevant events and exercise early control over a claim.' " *Olin*, 743 F.Supp. at 1052 (quoting *Commercial Union*, 822 F.2d at 271). Thus, if Fairchild had notified Fireman's Fund of the possible claim, the insurance company would have been in a position to negotiate with the state concerning appropriate remediation for the Basin. As it turns out, Fairchild alone negotiat-ed with all the agencies involved and now late in the day expects its insurance company to indemnify it.

11. This Court recognizes that in addition to the notice of occurrence provision, the policies at issue also contain an endorsement relieving Fairchild of its obligation to notify Fireman's Fund until its risk manager was informed of all the circumstances that should have triggered the notice of occurrence provision. It is undisputed that that official became aware of the problems with the sump by 1985. Tr. at 420.

12. Even if this Court was to find that it was the 1988 meeting that triggered the obligation to give notice, Fairchild still failed to give timely notice inasmuch as it waited over a year from the date of the meeting to advise the insurance company of the possibility of the claim.

release of chrome into the sump was not accidental within the meaning of the policy. The policies at issue contain a pollution exclusion. This exclusion, in turn, contains an exception that allows for coverage only if releases are "sudden and accidental".

It is undisputed that Fairchild intentionally released chrome into the sump. Indeed, they had government issued permits for just that purpose. Fairchild argues that although it intentionally released the chrome into the sump, it did not intend to pollute and thus any of the inadvertent consequences caused by discharge of chrome must be viewed as accidental. In *Technicon Electronics v. American Home Assurance Co.*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 534, 542 N.E.2d 1048, 1050–51 (Ct.App.1989), an insured made the same argument. The policies in *Technicon* contained the same pollution exclusion clause as that at issue here. The New York Court of Appeals found that argument to be without merit

> because the pollution exclusion clause, by its own terms, does not distinguish between intended or unintended consequences of intentional discharges; rather, it excludes from coverage liability based on all *intentional* discharges of waste whether consequential damages were intended or unintended. If the discharge was intentional, the disqualifying exclusion clause is operative and there is no coverage because the exception clause lacks it springboard. Inasmuch as the underlying complaint and Technicon's answer concedes that its dumping of wastes was deliberate, the occurrence cannot be "accidental" within the meaning of the policy.

*Id.* (emphasis in original).

Accordingly, to the extent the policies contain a pollution exclusion clause, this Court finds as a matter of law that Fireman's Fund has no duty to defend or indemnify Fairchild.[13]

### D. *Fireman's Fund Has No Duty To Defend Or Indemnify Fairchild For The Perc Plume Because The Discharge Of Perc Was Not Sudden*

Both parties agree that beginning in 1975 and continuing until the system was taken offline in 1988, Perc began escaping at a rate of about a gallon a day from its underground holding system. Moreover, although the parties do not agree as to the exact source of the leak, with Fireman's Fund theorizing that the underground storage tank leaked as a result of corrosion and Fairchild arguing that certain underground pipe fittings leaked as a result of thermal fluctuations, it is clear that whichever scenario is accepted, a gradual process caused a slow undetected leak that lasted many years.

The question before this Court is whether such a leak can be understood to be "sudden" within the meaning of the exception to the pollution exclusion clause found in the relevant policies. In *Technicon*, 544 N.Y.S.2d at 532, 542 N.E.2d at 1049, the New York Court of Appeals held that the pollution exclusion clause was "unambiguously plain and operative." Moreover, the *Technicon* court further held that "[s]ince the exception is expressed in the conjunctive, both requirements must be met for the exception to become operative." *Id.* at 533, 542 N.E.2d at 1050. In other words, the Court of Appeals has instructed that both words need to be invested with meaning.

The Court of Appeals defined "accidental" to mean an unintended discharge. *Id.* at 534, 542 N.E.2d at 1050–51. Unfortunately, the *Technicon* court did not define the word "sudden".[14] Fairchild argues that the plain

**13.** The parties agree that all the policies from 1972 forward contain the clause. Additionally, although the 1971 policy does not contain the clause, in 1971, the state of New York required that all insurance policies include the clause. Consequently, this Court finds that the exclusion applies to that policy as well. The policies predating 1971 do not contain the clause and the Court was presented with no evidence that suggests that the absence of the clause in those policies was inadvertent. However, because the

Court directed a verdict based on late notice, evidence relating to this issue may not have been presented to the Court. Accordingly, this Court makes no finding with respect to whether the earlier policies contain the pollution exclusion clause.

**14.** If the procedural mechanism was available, this Court may have very well certified the issue to the New York Court of Appeals. However, there is no mechanism in New York allowing

meaning of the word "sudden" means unexpected and that the Perc leak was in fact unexpected.[15] Fireman's Fund, however, argues that Fairchild's definition ignores the temporal aspect of the term. According to the insurance company, a release cannot be "sudden" if it lasts a long time.

Fairchild relies on a line of New York appellate division cases to support its contention that undetected underground leaks fall within the exception. In *Allstate Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (4th Dep't 1980), the court held that "the negligent installation or maintenance of the storage tank could result in an accidental discharge or escape of gasoline which would be both 'sudden and accidental' though undetected for a substantial period of time." The court further held that "the word 'sudden' as used in liability insurance need not be limited to an instantaneous happening." *Id.*

Additionally, in *Colonie Motors, Inc. v. Hartford Accident and Indem. Co.*, 145 A.D.2d 180, 538 N.Y.S.2d 630, 632 (3d Dep't 1989), an underground pipe cracked and leaked, causing damage. In that case, the insured argued that because the crack was unexpected, it should be viewed as "sudden", despite the fact that the leak went undetected and continued for a period of time.

The court stated that although it believed that the word sudden "should be accorded some meaning other than that already encompassed by the word 'accidental', we are of the view that the phrase 'sudden and accidental' should be construed in its entirety, without undue reliance upon discrete definitions of the two operative words that make up the phrase." *Id.* The court went on to hold that as long as the initial discharge of waste was sudden and accidental it is irrelevant that the undetected leak continued for a period of time. *Id.* In *State of New York v. Aetna Casualty and Surety Co.*, 155 A.D.2d 740, 547 N.Y.S.2d 452, 453 (3d Dep't 1989), the third department reaffirmed its position with respect to underground undetected leaks.

Finally, in *Petr–All Petroleum Corp. v. Fireman's Ins. Co.*, 188 A.D.2d 139, 593 N.Y.S.2d 693, 695 (4th Dep't 1993), an underground gasoline storage tank leaked causing damage to adjacent property. The adjacent property owner brought suit against the gas station alleging that the damage was caused by the gas station's negligence. The gas station in turn sought a declaration that its insurers were obligated to defend and indemnify it.

The *Petr–All* court found that the landowner's complaint did not allege "that the leak resulted from a repeated or continuous business operation." *Id.* Moreover, the court stated that the complaint "can be interpreted to allege an accidental and unexpected

district courts to certify questions. *See* 22 NYCRR 500.17.

**15.** It should be noted, that if this Court was to accept Fairchild's argument that "sudden" only means unexpected, there would be almost no instance when the exclusion would apply in the underground storage context. When asked about this at oral argument, Fairchild argued that the only time the exclusion should apply in this context is when an insured employs sophisticated monitoring devices which can indicate that a leak is imminent and the insured ignores the early warning. This is so, according to Fairchild, even though an insured may be under no legal obligation to employ these methods.

The rationale for New York's requirement that the pollution exclusion clause be incorporated in insurance policies was set forth in the Governor's Memorandum which was quoted in *Technicon Electronics Corp. v. American Home Assurance Co.*, 141 A.D.2d 124, 533 N.Y.S.2d 91, 102 (2d Dep't 1988). The Governor's Memorandum stated:

The purpose of the bill is to prohibit commercial or industrial enterprises from buying insurance to protect themselves against liabilities arising out of their pollution of the environment....

New York State has adopted stringent standards to prohibit despoiling the environment through the discharge of noxious substances into the water and air. These standards, which are the most comprehensive in the Nation, go far beyond merely strengthening and supplementing the common law rules against pollution. As strict as these laws are, however, their effectiveness could be substantially reduced if polluters were able to purchase insurance to protect themselves from having to pay fines and other liabilities that may be imposed upon them for polluting.

*Id.*

It is clear, that the definition promoted by Fairchild would undermine the policy underlying the pollution exclusion.

**1182**

leak from a subsurface pipe or tank that continued undetected for a period of time, an event both sudden and accidental within the meaning of the [ ] policy." *Id.* It should be noted that although the landowner's complaint makes no mention of it, facts extrinsic to the complaint suggested that the leak may have been caused when a customer drove away from the gasoline dispenser without removing the nozzle from her gas tank.[16] *Id.*

The cases relied on by Fairchild do suggest that at least some New York courts have interpreted the word "sudden" to mean unexpected and have thus found that underground leaks that continue undetected can be sudden and accidental within the meaning of the exception. Not all New York courts, however, define "sudden" to mean unexpected. In *Technicon Electronics v. American Home Assurance Co.,* 141 A.D.2d 124, 533 N.Y.S.2d 91 (2d Dep't 1988), *aff'd* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (Ct. App.1989), the court cited with approval federal and sister state cases that attached a temporal meaning to the word "sudden". Thus, the appellate division in *Technicon* accepted the following definitions of the word "sudden": 1) an abrupt or precipitous event; 2) an event that occurs abruptly, without warning; and 3) an antonym to an event which happens gradually or over an extended time. *Technicon,* 533 N.Y.S.2d at 98 (citing cases).

Moreover, in *Borg–Warner Corp. v. Insurance Co. of North America,* 174 A.D.2d 24, 577 N.Y.S.2d 953 (3d Dep't 1992), the third department clarified its position with respect to the meaning of the exception. Relying on the Court of Appeals opinion in *Technicon,*

the *Borg–Warner* court rejected the plaintiffs argument "that 'suddenly' simply means 'unexpected'."[17] *Borg–Warner,* 577 N.Y.S.2d at 957. The court stated that "[o]nly by allowing 'sudden' to retain its temporal aspect does the term attain independent significance. Thus, for a release or discharge to be 'sudden' within the meaning of the pollution exclusion, it must occur abruptly or quickly or 'over a short period of time.'" *Id.* (citations omitted).

The *Borg–Warner* court further stated that

[b]oth *Colonie Motors* and *Aetna Cas.* involved leakages from underground storage tanks or pipes. Far from disregarding the "sudden" prong of the exception, in each case this court held that it could not exclude the possibility that the crack that precipitated the leak had been abrupt, but had remained undetected for a lengthy period of time.

*Id.*

▪ Likewise, in the *Petr–All* case, the possibility existed that the leak occurred as a result of a motorist pulling away from the pump without removing the nozzle from her gas tank. Thus, this leak too may have been precipitated by an abrupt event. Unlike the leaks in *Colonie Motors, Aetna Casualty* or *Petr–All,* it is undisputed that the leak in this case was not caused by an abrupt event.[18] Rather, both parties agree that the leak was caused by a gradual natural process. This Court finds that neither a tank failure caused by corrosion nor a pipe failure caused by thermal fluctuations qualifies as a "sudden" event.[19] Because the release of Perc was not

---

**16.** The *Petr–All* court noted that a court "in deciding whether an insurer has a duty to defend, may consider extrinsic facts submitted by the insured to show that coverage under the policy may exist." *Petr–All,* 593 N.Y.S.2d at 695.

**17.** The *Borg–Warner* court reasoned that inasmuch as the Court of Appeals ruled that "sudden" and "accidental" are independent requirements, to define sudden as meaning unexpected would strip the term of any independent meaning. *Borg–Warner,* 577 N.Y.S.2d at 957.

**18.** This Court cannot accept Fairchild's argument that the pipe failure was "sudden" despite the fact that the process leading to the crack was .

a gradual one. It is apparently Fairchild's position that there was some metaphysical moment before which the leak was not present. And thus, when the leak finally manifested itself, it was an abrupt event. Under this type of reasoning, no event whatsoever could conceivably fall outside the pollution exception.

**19.** As a point of clarification, it is not the Court's position that the Perc discharge was not "sudden" because the leak continued for many years undetected. Rather, the Court's analysis is focused on the cause of the leak. Thus, although the Court finds in favor of Fireman's Fund, it does not adopt Fireman's Fund argument that the release of Perc cannot be viewed as "sudden"

"sudden" within the meaning of the exception to the pollution exclusion, this Court finds as a matter of law that Fireman's Fund has neither the duty to defend nor indemnify Fairchild for the costs of remediating the plume.

### III. CONCLUSION

For the above-stated reasons, this Court entered judgment as a matter of law in favor of Fireman's Fund pursuant to Rule 50 of the Federal Rules of Civil Procedure.

SO ORDERED.

because the leak lasted many years. Had there been evidence suggesting that the leak was caused by some instantaneous happening, this Court would have found that the release was "sudden" even though the leak remained undetected for a period of years.