**SNYDERGENERAL CORPORATION,**
Plaintiff,

v.

**CENTURY INDEMNITY COMPANY,**
Defendant.

**Civ. A. No. 3:93–CV–0832–D.**

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 21, 1995.

992

D. Ronald Reneker (argued), of Bush Craddock & Reneker, L.L.P., Dallas, TX, and Michael L. Jones and Frieda A. Clark of Henry, Meier & Jones, L.L.P., Dallas, TX, for plaintiff.

Ralph W. Dau (argued) and Jeffrey W. Kilduff of O'Melveny & Myers, Los Angeles, CA, and Morris Harrell and Jerry K. Warren of Locke Purnell Rain & Harrell, Dallas, TX, for defendant.

FITZWATER, District Judge:

This action to recover pursuant to a comprehensive general liability umbrella insurance policy for environmental cleanup costs, and on related theories, requires the court to interpret three separate provisions of the policy: (1) the pollution exclusion; (2) the "care, custody or control" exclusion; and (3) the term "damages" in the insuring agreement of the policy. Because the court holds that the cleanup costs are not "damages" within the meaning of the policy, the court concludes that plaintiff is not entitled to recover the environmental cleanup expenses for which it sues.

## I

Plaintiff SnyderGeneral Corporation ("SnyderGeneral") brings this lawsuit to recover from defendant Century Indemnity Company ("Century") for breach of contract, breach of duty of good faith and fair dealing and violation of the Texas Insurance Code, and declaratory judgment, based upon Century's refusal to pay a claim made by SnyderGeneral pursuant to a comprehensive general liability ("CGL") umbrella policy (the "Policy") that SnyderGeneral purchased from Century. The Policy insured SnyderGeneral during the period April 3, 1983 to April 3, 1984. By incorporating the terms of an un-

derlying CGL policy owned by SnyderGeneral,[1] the Policy excluded coverage for pollution liability except for "sudden and accidental" discharges. The Policy provided, in relevant part:

This insurance does not apply: ... to ... property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water: *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental* [.]

D.MSJ App. Ex. 3, Exclusion (f) (emphasis added).

In April 1982 SnyderGeneral purchased the Climate Control Division of The Singer Company. As part of the purchase, SnyderGeneral acquired a manufacturing facility located in Wilmington, North Carolina. From April 1982 to July 1988 SnyderGeneral operated the Wilmington facility. In 1988 SnyderGeneral sold the facility to Heatcraft, Inc. ("Heatcraft"), retaining responsibility for the pollution discharge that is the subject of this litigation. SnyderGeneral used and stored the industrial degreaser solvent trichloroethane ("TCA") during the manufacturing process. SnyderGeneral employees checked the level of TCA in the storage tanks on a daily basis. Plant Manager Donald Knowlton noticed a dramatic loss of TCA from one of the tanks on November 18, 1983. SnyderGeneral employees observed several leaks, each the size of the end of a ballpoint pen,[2] on the side of that tank. They also saw rust surrounding the holes, and concluded the leak had been caused by corrosion.

The groundwater at the Wilmington facility is now contaminated with TCA. SnyderGeneral regularly pumped the groundwater from wells for use during its manufacturing process.

---

1. Commercial Union Insurance Company was SnyderGeneral's primary CGL carrier.

2. Several employees described small, corroded rust pits the size of pinholes. D.App. at ¶ 4. This could mean the holes were the size of a pin, but at least one employee described the holes as

being the size of the end of a ballpoint pen. The court will therefore refer to pen hole size leaks, because this interpretation of the evidence is more favorable to SnyderGeneral as the summary judgment nonmovant.

Over a number of years, SnyderGeneral incurred environmental cleanup costs that it contends were the result of the 1983 TCA discharge. SnyderGeneral made these expenditures in order to comply with an Administrative Order on Consent governing the voluntary cleanup of the Wilmington facility. Neither SnyderGeneral, nor its successor, Heatcraft, was sued regarding the cleanup of the Wilmington facility. In a May 1988 letter, SnyderGeneral notified Century of its claim for Policy coverage for the cleanup expenses. SnyderGeneral's counsel advised Century of the claim in letters written in July 1992 and October 1992. The parties dispute whether Century responded to this correspondence.

Century now moves for summary judgment on the breach of contract claim[3] based on three Policy provisions: (1) the pollution exclusion; (2) the "care, custody or control" exclusion; and (3) the term "damages" in the insuring agreement of the Policy. Century also contends it is entitled to summary judgment on SnyderGeneral's claim for breach of duty of good faith and fair dealing and violation of the Texas Insurance Code.

## II

Century contends it is entitled to summary judgment dismissing SnyderGeneral's breach of contract claim. The first question presented is whether a reasonable trier of fact could find that the TCA discharge for which SnyderGeneral seeks coverage was "sudden and accidental."

## A

■ The parties agree that this issue is governed by Texas law, which requires the court to interpret the phrase "sudden and accidental" as a matter of law. See Guaranty Nat'l Ins. Co. v. North River Ins. Co., 909 F.2d 133, 135 (5th Cir.1990) (stating that interpretation of insurance contract is question of law for court). Section 21.58(b) of the Texas Insurance Code provides that the insurer has the burden of establishing a policy exclusion. Tex.Ins.Code Ann. § 21.58(b) (West Supp.1995) ("[T]he insurer has the burden of proof as to any avoidance or affirmative defense ... [, and] [a]ny language of exclusion in the policy and any exception to coverage claimed by the insurer constitutes an avoidance or an affirmative defense."). Where, as here, the dispute involves an exception to a policy exclusion, § 21.58(b) has been construed to place the burden of proof upon the insured. See Telepak v. United Servs. Auto. Ass'n, 887 S.W.2d 506, 506–07 (Tex.App.1994, writ denied). Therefore, SnyderGeneral has the obligation of establishing that its claim for coverage falls within the exception.

Because Century does not have the burden of proof, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support SnyderGeneral's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If Century does so, then SnyderGeneral must go beyond its pleadings and designate specific facts showing that there is a genuine issue for trial. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (per curiam). Summary judgment is mandatory where the nonmoving party fails to meet this burden. Id. at 1076. Consequently, to defeat Century's summary judgment motion, SnyderGeneral must adduce evidence that would permit a reasonable trier of fact to find that the discharge for which it seeks Policy coverage was "sudden and accidental."

## B

The court will decide as a threshold issue whether the phrase "sudden and accidental" has a temporal component.[4] Neither party

---

3. SnyderGeneral's declaratory judgment action is a remedial overlay on its breach of contract claim. SnyderGeneral seeks a declaratory judgment that Century is obligated to pay SnyderGeneral for its cleanup expenditures in excess of those covered by SnyderGeneral's primary insurer. The court therefore addresses the declaratory judgment action in tandem with, and under the rubric of, SnyderGeneral's breach of contract claim, and its analysis applies equally to both.

4. At latest count, the highest courts of Florida, Massachusetts, Michigan, Minnesota, North Carolina, and Ohio have defined the term "sudden" as unambiguously containing a temporal component, while the highest courts of Colorado, Geor-

has cited, nor has the court located, any controlling Texas case. In this diversity action the court must therefore make an *Erie*[5] prediction concerning what the Texas Supreme Court would decide if presented with the question.

### 1

Some courts have held that the word "sudden" is subject to two reasonable interpretations. The term could connote an abrupt happening or a boom-type event, or it could refer to an unforeseen event. Under the doctrine of *contra proferentem,* courts construe ambiguities in favor of the insured, *e.g., Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984), and some have applied this doctrine to the pollution exclusion. By viewing the "sudden and accidental" language as ambiguous, these courts have allowed insureds to recover for unexpected or unforeseen pollution liability. *E.g., Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083, 1092 (Colo.1991) (holding that term "sudden" is ambiguous, and construing it in favor of insured to mean unexpected or unintended); *Claussen v. Aetna Cas. & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686, 689–90 (1989) (holding that "sudden" refers to unexpectedness rather than to duration of event).[6]

Among federal courts, however, there is an "emerging majority" that holds that the term "sudden" unambiguously includes a temporal component. *Trico Indus., Inc. v. Travelers Indem. Co.,* 853 F.Supp. 1190, 1194 (C.D.Cal. 1994) (citing cases from the "emerging majority").[7] By invoking the plain meaning

---

gia, Illinois, New Jersey, Washington, West Virginia, and Wisconsin have held that "sudden" is ambiguous and have construed the term in favor of the insured. *See Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 151 (7th Cir.1994) (listing state courts of last resort that have decided the issue).

**5.** *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**6.** Although it is well-established under Texas law that ambiguous language in an insurance policy will be construed in favor of the insured, *e.g., Puckett,* 678 S.W.2d at 938; *Phillips v. Union Bankers Ins. Co.,* 812 S.W.2d 616, 620 (Tex.App. 1991, no writ), the rule does not apply to plain and unambiguous terms contained in an insurance policy. *Puckett,* 678 S.W.2d at 938 (stating that it is duty of court to enforce plain meaning of unambiguous words); *Nationwide Prop. & Cas. Ins. Co. v. McFarland,* 887 S.W.2d 487, 492 (Tex.App.1994, writ denied). The court applies ordinary rules of construction when determining whether certain policy terms are ambiguous. *Phillips,* 812 S.W.2d at 620 (stating that policy is ambiguous only when pertinent rules of construction leave genuine uncertainty); *see also Nationwide,* 887 S.W.2d at 492 (holding that all parts of insurance contract are construed together to effectuate intent of parties). The court must consider the policy as a whole, and it must give effect to each part of the policy. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex. 1994). No particular phrase, sentence, or section of the policy should be considered independently of the other provisions. *Id.* at 134.

**7.** The court's independent research bolsters *Trico'*s characterization of an "emerging majority." Of the federal courts that have predicted how a state supreme court would define "sudden," the majority of cases decided within the last five years have determined that this term contains a temporal component. This approach excludes all federal cases applying the state law of the 13 states, *see supra* note 4, whose highest courts have defined the term to mean "unexpected or unintended."

*Federated Mut. Ins. Co. v. Botkin Grain Co.,* 64 F.3d 537, 541 (10th Cir.1995) (Kansas law); *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.,* 52 F.3d 1522, 1528 (10th Cir.1995) (Utah law); *Cincinnati Ins.,* 40 F.3d at 152 (Indiana law); *Aeroquip Corp. v. Aetna Cas. & Sur. Co.,* 26 F.3d 893, 894 (9th Cir.1994) (California law); *Smith v. Hughes Aircraft Co.,* 22 F.3d 1432, 1437 (9th Cir.1993) (Arizona and California law); *U.S. Fid. & Guar. Co. v. Morrison Grain Co.,* 999 F.2d 489, 493 (10th Cir.1993) (Kansas law); *Aetna Cas. & Sur. Co. v. General Dynamics Corp.* 968 F.2d 707, 710 (8th Cir.1992) (Missouri law); *Hartford Acc. & Indem. Co. v. U.S. Fid. & Guar. Co.,* 962 F.2d 1484, 1490 (10th Cir.) (Utah law), *cert. denied,* 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992); *Northern Ins. Co. of N.Y. v. Aardvark Assocs., Inc.,* 942 F.2d 189, 193 (3d Cir.1991) (Pennsylvania law); *State of New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1428 (2d Cir.1991) (New York law); *A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 933 F.2d 66, 72 (1st Cir.1991) (Maine law); *FL Aero. v. Aetna Cas. & Sur. Co.,* 897 F.2d 214, 219 (6th Cir.) (Michigan law prior to a controlling precedent by Michigan Supreme Court), *cert. denied,* 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990); *EDO Corp. v. Newark Ins. Co.,* 878 F.Supp. 366, 374 (D.Conn. 1995) (Connecticut and New York law); *American States Ins. Co. v. Hanson Indus.,* 873 F.Supp. 17, 25–26 (S.D.Tex.1995) (Texas law); *American States Ins. Co. v. Sacramento Plating, Inc.,* 861 F.Supp. 964, 970 (E.D.Cal.1994) (California law); *Chemetron Invs., Inc. v. Fidelity & Cas. Co. of N.Y.,* 886 F.Supp. 1194, 1197 (W.D.Pa.1994)

doctrine, courts that follow this analytical approach have concluded that "sudden" refers to an abrupt event. *E.g., Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392, 397 (1991) (holding that plain and ordinary meaning of term "sudden" includes temporal element joining together the immediate and the unexpected). Although insureds have pointed to dictionary definitions of "sudden" that include both abrupt as well as unforeseen events, the courts have rejected this argument by considering its context within the phrase "sudden and accidental." *E.g., Trico Indus.*, 853 F.Supp. at 1194–95 (holding that sudden has temporal component despite differing dictionary definitions because "sudden" and "accidental" would otherwise have the same meaning).

■ The court predicts that the Supreme Court of Texas will agree with the emerging majority of federal courts and conclude that the phrase "sudden and accidental" has a temporal component. The word "sudden" appears as part of the phrase "sudden and accidental," and the word "accidental" already refers to unforeseen events. To hold that "sudden" can mean either abrupt or unforeseen is to render the word superfluous. Texas courts attempt to avoid redundancy by giving contractual terms independent meaning. *See Collier v. Employers Nat'l Ins. Co.*, 861 S.W.2d 286, 288 (Tex.App.1993, writ denied) ("In all contract disputes, words that are subject to more than one interpretation are defined so that they are harmonious with, rather than repugnant to, the other provisions of the contract"). In the context of the phrase "sudden and accidental," it would not square with Texas law to interpret both terms to mean "unforeseen."

In addition, although construing the phrase "sudden and accidental" to mean "unexpected or unforeseen" would force insureds to demonstrate that they did not expect or intend to cause pollution damage, thus preventing the obvious moral hazard that would result if insureds were covered for intentionally wrongful acts, the standard CGL policy already excludes coverage in all situations where insureds expect or intend damage. *See* D.MSJ App. Ex. 1 (defining "occurrence"). While it might not be completely redundant to have an expected or intended exception for pollution alone,[8] the standard form policy illustrates that insurers know how to say "expected or intended." They could easily have provided coverage for "unexpected or unintended" pollution if this had been their intent. Instead, the use of the phrase "sudden and accidental" discloses a different meaning.

2

SnyderGeneral cites *Pioneer Chlor Alkali Co. v. Royal Indem. Co.*, 879 S.W.2d 920 (Tex.App.1994, no writ), in support of its breach of contract claim.

■ *Pioneer* contains language that suggests that a split of authority is alone sufficient to create ambiguity that favors the insured. *Id.* at 929. This premise would be akin to that adopted by the Colorado Supreme Court, when it concluded that the term "sudden" was ambiguous based partly

(Pennsylvania law); *American Ins. Co. v. Fairchild Indus.*, 852 F.Supp. 1173, 1182 (E.D.N.Y. 1994) (New York law), *aff'd*, 56 F.3d 435 (2d Cir.1995); *Staefa Control–Sys. Inc. v. St. Paul Fire & Mar. Ins. Co.*, 847 F.Supp. 1460, 1468 (N.D.Cal.) (California law), *opinion amended on other grounds*, 875 F.Supp. 656 (1994); *Asbestos Removal Corp. of Am., Inc. v. Guaranty Nat'l Ins. Co.*, 846 F.Supp. 33, 35 (E.D.Va.1994) (Mississippi and New York law), *aff'd*, 48 F.3d 1215 (4th Cir.1995); *Koppers Co. v. Aetna Cas. & Sur. Co.*, 840 F.Supp. 390, 394 (W.D.Pa.1993) (Pennsylvania law); *Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.*, No. 91–2533, 1993 WL 566032, at *12 (S.D.Tex. Oct. 8, 1993) (Texas law); and *Oklahoma Publishing Co. v. Kansas City Fire & Mar. Ins. Co.*, 805 F.Supp. 905, 909 (W.D.Okla. 1992) (Oklahoma law), all hold that "sudden" unambiguously contains a temporal component.

*New Castle County v. Hartford Acc. & Indem. Co.*, 933 F.2d 1162, 1198–99 (3d Cir.1991) (Delaware law); *Harleysville Mut. Ins. Co. v. Sussex County*, 831 F.Supp. 1111, 1121 (D.Del.1993) (Delaware law), *aff'd*, 46 F.3d 1116 (1994); *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F.Supp. 1406, 1411 (D.Del.1992) (Connecticut law); and *MAPCO Alaska Petroleum, Inc. v. Central Nat'l Ins. Co. of Omaha*, 795 F.Supp. 941, 947 (D.Alaska 1991) (Alaska law), hold that "sudden" is ambiguous, and construe the term to mean unexpected or unintended.

8. This would be true because under the normal expected or intended exception, the insured must expect or intend the property damage, whereas the insured would probably have to expect or intend only the discharge of pollution for the pollution exclusion.

on this reasoning. *See Hecla Mining Co.,* 811 P.2d at 1092 n. 13. If Texas deemed a policy term to be ambiguous each time there was split of authority regarding how the term should be interpreted, this court would be obligated to construe the Policy in favor of SnyderGeneral. The court declines to find that Texas has adopted such a rule.

Few Texas cases have addressed this issue. In *Pioneer* the court appeared to summarize the holding of a prior case for the proposition that a split in authority creates ambiguity, but the opinion that *Pioneer* cited did not adopt such a rule. *Pioneer,* 879 S.W.2d at 929. In fact, five years earlier, an insured argued that conflicting interpretations rendered a CGL policy provision ambiguous, and the same court of appeals expressly rejected the argument:

> Additionally, this court wonders even in those cases where legitimate, differing interpretations of the same language result, at what point the language becomes ambiguous as a matter of law. Is that point reached when the jurisdictions are split evenly, when there is a 40%, 30%, or 20% minority; or can a court no longer consider the issue for itself when only one other court reaches an opposite conclusion? This court prefers the alternative which allows each court to decide the issue in light of the policy terms and the facts before it.

*T.C. Bateson Constr. Co. v. Lumbermens Mut. Cas. Co.,* 784 S.W.2d 692, 698 (Tex.App. 1989, writ denied) (quoting *Stillwater Condominium Ass'n v. American Home Assurance Co.,* 508 F.Supp. 1075, 1080 (D.Mont.1981), *aff'd,* 688 F.2d 848 (9th Cir.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983)); *see also Union Pac. Resources Co. v. Aetna Cas. & Sur. Co.,* 894 S.W.2d 401, 405 (Tex.App.1994, writ denied) (noting divided case law and stating that neither conflicting views of coverage nor disputation is enough to create ambiguity).

The court holds that *Bateson* more accurately reflects Texas law because the issue was raised in that case, and the court expressly analyzed and rejected the argument. Were the rule as *Pioneer* suggests, a significant majority of courts could construe "sudden" to have a temporal component, but if only a few courts interpreted "sudden" to mean unexpected or unintended, the decision would compel Texas courts to resolve an unambiguous term in favor of the insured.

SnyderGeneral also cites *Pioneer*'s interpretation of a boiler and machinery policy as controlling Texas precedent. The policy in *Pioneer* covered losses caused by a "sudden and accidental" breakdown of the insured's equipment, but explicitly excluded *inter alia* corrosion. *Pioneer,* 879 S.W.2d at 925. Plaintiff manufactured chlorine, which required the circulation of brine to cool and liquefy the chlorine gas. *Id.* A cloth rag somehow found its way into the plaintiff's machinery, and the rag diverted the flow of brine, which caused an erosion/corrosion effect that eventually led to the release of 42 tons of chlorine into the atmosphere. *Id.* SnyderGeneral relies on the following language from *Pioneer* for the proposition that "sudden and accidental" has no temporal component:

> Under the reasoning of these cases, the time it actually took for the erosion/corrosion mechanism to breach the tubes is immaterial. The actual penetration of the tubes was unexpected and unforeseen, complying precisely with the definitions of "sudden" and "accidental." At one point in time the tubes were whole, an instant later they were breached.

*Id.* at 937.

*Pioneer* involved a slightly different issue than does the present case. The boiler and machinery policy excluded coverage for corrosion, but did not explicitly exclude damage caused by corrosion. The insured argued that although corrosion existed and it could not recover for the replacement of corroded machinery, it was nevertheless covered for a sudden and accidental event caused by corrosion. The court agreed with the insured on this point, but it made ambiguous statements regarding whether "sudden and accidental" included a temporal component. *Compare id.* at 936 (stating that corrosion of an air conditioner would not be covered except for the possibility that the air conditioner burst and exploded) *and id.* at 937 ("Here, while the corrosion/erosion mechanism that caused

the holes in the liquefier tubes was slow, the breach of the tubes was instantaneous, and therefore, sudden and accidental") *with* the language cited by SnyderGeneral. This suggests that *Pioneer* did not attempt to define "sudden and accidental" in all circumstances.

The Supreme Court of Florida has rejected the proposition that the phrase "sudden and accidental" in the pollution exclusion of a CGL policy should be construed in the same manner as a boiler and machinery policy. *See Dimmitt Chevrolet, Inc. v. Southeastern Fid. Ins. Corp.,* 636 So.2d 700, 705 n. 6 (Fla.1993). To do so would ascribe universal meaning to a phrase regardless of the context. *Id.* The boiler and machinery policy provides coverage when the *damage* is sudden and accidental, whereas the pollution exclusion provides coverage when the *discharge* occurs suddenly or accidentally. *Id.* By stating that the damage must be sudden and accidental and listing certain excluded causes of damage,[9] the Pioneer policy could reasonably be interpreted as saying nothing more about the discharge. In the absence of any evidence of linkage between the use of the phrase "sudden and accidental" in boiler and machinery policies and its use in CGL policies, the court rejects SnyderGeneral's argument.

### 3

█ The court therefore holds that the phrase "sudden and accidental" unambiguously has a temporal component, and the pollution exclusion does not permit coverage for a discharge [10] that is merely unexpected or unintended.

### C

The court must next decide if there is a genuine issue of material fact concerning whether the November 18, 1983 TCA discharge was in fact "sudden."

Some courts that have recognized that "sudden" has a temporal component have also concluded—without explaining the analytical path that they have followed—that a discharge was not "sudden." [11] Several courts have emphasized the cause of the discharge.[12] A small minority has looked to the duration of the time lapse before the discharge resulted in property damage.[13] The reported cases typically address pollution coverage disputes concerning long-term discharges. No court appears to have decid-

---

**9.** The Boiler and Machinery Policy in *Pioneer* provided:

"Accident" is defined by the Policy as: ... a sudden and accidental breakdown of the "object" or a part of the "object." At the time the breakdown occurs, it must manifest itself by physical damage to the "object" that necessitates repair or replacement.

None of the following is an "accident": a. Depletion, deterioration, corrosion or erosion; b. Wear and tear; c. Leakage at any valve, fitting, shaft seal, gland packing, joint or connection; d. Breakdown of any vacuum tube, gas tube or brush; e. Breakdown of any electronic computer or electronic data processing equipment; f. Breakdown of any structure or foundation supporting the "object" or any of its parts; g. The functioning of any safety or protective device.

*Pioneer,* 879 S.W.2d at 925–26.

**10.** The Policy refers to a "discharge, dispersal, release or escape." For clarity, and because any distinction among these terms is immaterial in the context of today's decision, the court will refer only to a "discharge."

**11.** *E.g., Smith,* 22 F.3d at 1438 (affirming summary judgment because long-term waste disposal not sudden); *Dimmitt Chevrolet,* 636 So.2d at 705 (holding that discharge of recycled oil into unlined pits from 1954 to 1974 not "sudden").

**12.** *Federated,* 64 F.3d at 541 (sudden has objective temporal component referring to both inception and duration of pollution); *American Ins.,* 852 F.Supp. at 1182 (E.D.N.Y.1994) (test is whether leak precipitated by abrupt event); *Staefa,* 847 F.Supp. at 1469 ("[T]he sudden accident exception applies if there is any possibility that the gradual migration of pollutants ... was caused by a sudden accident, such as an explosion."); *Northville Indus. Corp. v. CIGNA Prop. & Cas. Ins. Co.,* No. 5277–88, 1994 Mealey's Lit. Rptr. Vol. 8 at C–6 (leak caused by internal corrosion cannot be abrupt); *ACL Technologies, Inc. v. Northbrook Prop. & Cas. Ins. Co.,* 17 Cal.App.4th 1773, 22 Cal.Rptr.2d 206, 208, 219 (1993) (affirming finding of not sudden because caused by gradual corrosion); *see also Gridley Assocs., Ltd. v. Transamerica Ins. Co.,* 828 P.2d 524, 527 (Utah Ct.App.1992) (emphasizing no evidence of corrosion or deterioration after finding clean break of pipe to be sudden).

**13.** *Bell Lumber & Pole Co. v. U.S. Fire Ins. Co,* 60 F.3d 437, 443 (8th Cir.1995); *Krawczewski v. Western Cas. & Sur. Co.,* 506 N.W.2d 656, 659 (Minn.Ct.App.1993).

ed the issue in the context of an insured's prompt discovery of a discharge for which insurance coverage is sought.[14] To determine if there is a genuine issue concerning whether the TCA discharge was sudden, the court will define the temporal component of sudden, and will then determine which aspect of a discharge must be sudden in order for there to be coverage.

### 1

The temporal component of the term "sudden" can reasonably refer solely to the duration of an event. For example, rainstorms that begin and end instantaneously or abruptly are often referred to as "sudden" storms.

A second category of "sudden" events includes instances in which a characteristic other than the duration of the incident justifies the classification. Several courts have noted that sudden merges a temporal component with the unforeseen or unexpected. *E.g., American States Ins. Co. v. Sacramento Plating, Inc.*, 861 F.Supp. 964, 970 (E.D.Cal. 1994) (sudden conveys an unexpected event that is abrupt or immediate in nature). By joining a temporal component with an unexpected occurrence, sudden refers to an unexpected event of limited duration. A discharge may be deemed sudden if it begins and ends within a short time-frame, and is unexpected. The "unexpected" aspect of sudden overlaps somewhat with the definition of accidental, but is not impermissibly redundant because of the temporal component in the term "sudden."

■ The court therefore concludes there are two reasonable interpretations of the temporal element of "sudden." It can mean an instantaneous or abrupt event, or an unexpected incident of limited (although longer than instantaneous) duration.

### 2

The court next decides which aspect of a discharge must be "sudden."

#### a

■ In *Bell Lumber & Pole Co. v. U.S. Fire Ins. Co*, 60 F.3d 437, 443 (8th Cir.1995), the Eighth Circuit held that a sudden discharge occurred when contaminants reached third party property in a rapid fashion. The insured's operations included numerous tanks and pipes, and oil and other substances occasionally escaped from these tanks or spilled during the manufacturing process. *Id.* at 440. The contaminants did not enter the groundwater until many years later. *Id.* at 441. The insured argued that the release of contaminants from their state of containment determined whether a sudden and accidental release had occurred. *Id.* at 441–42. The Eighth Circuit held that the contaminants must suddenly hit the groundwater, which in the state of Minnesota constitutes third party property damage. *Id.* at 443. The court affirmed summary judgment entered in favor of the insurer because the record showed that the contaminants had gradually seeped into the groundwater.

The *Bell Lumber* panel based its decision on Minnesota law. CGL policies provide coverage for property damage caused by an "occurrence," and this definition determines the existence of coverage because it controls which policy year or years cover an event that spans several years. The Eighth Circuit interpreted Minnesota law as applying an injury-in-fact trigger that provided coverage when the contaminants reached third party property. *Id.* The panel reasoned that the "sudden and accidental" exception paralleled the definition of occurrence, and afforded coverage only when the contaminants suddenly reached the groundwater.

In *Union Pac. Resources* the court addressed the question whether the "occurrence" within the meaning of a pollution ex-

---

**14.** Although the question was presented in *Upjohn,* the Michigan Supreme Court decided the case without reaching the issue. Upjohn pumped chemical byproducts into an underground storage tank. Upjohn measured the tank level daily. Prior to August 16, 1992 the tank level measured 10 inches (475 gallons). On August 16 tank level measurements read three inches (80 gallons). The tank had developed three holes due to corrosion. Despite the discrepancy in measurements, Upjohn pumped byproduct into the tank until the end of the month. The court decided the case on the basis that Upjohn intended pollution damage by continuing to pump byproduct into the tank. *Upjohn,* 476 N.W.2d at 398.

clusion in a CGL policy was waste disposal by the insured, or leakage into the environment. 894 S.W.2d at 404. The court held the insured's deposit could not be the triggering event; instead, it was the subsequent escape of pollutants from the disposal site. *Id.*

Because Texas adheres to a different approach from the one taken in Minnesota, the court predicts that Texas will follow the majority of courts that reject the proposition that discharge refers to the moment contamination reaches third party property.[15]

### b

■ The time of discovery represents another post-discharge event to which courts could look when determining the suddenness of a discharge.[16] The time of discovery does not, however, control the legal determination whether a discharge occurred instantaneously, or represented an unexpected leak. Although prompt detection may corroborate that a discharge was of short duration, neither prompt nor dilatory discovery can retroactively change the historical facts of the occurrence. In addition, Texas' focus on the discharge with respect to the definition of "occurrence" suggests that Texas would not give controlling weight to post-discharge factors such as the amount of time until discovery. The court predicts that Texas will follow those courts that reject the proposition that the time of discovery determines whether a discharge is sudden. *See SCSC Corp. v. Allied Mut. Ins. Co.,* 515 N.W.2d 588, 597 (Minn.Ct.App.1994) (stating that suddenness of release from state of containment and not the length of time before discovery determines "sudden"), *aff'd in part, rev'd in part,* 536 N.W.2d 305 (Minn.1995); *Gridley Assocs., Ltd. v. Transamerica Ins. Co.,* 828 P.2d 524, 527–28 (Utah Ct.App.1992) (stating that fact of late discovery irrelevant to suddenness because it is discharge that matters).

### c

■ The court next considers whether the determining event is the instant that pollutants escape their state of containment. Under this interpretation, the test is whether the leak started abruptly. This approach, known as the "metaphysical moment" argument, suggests that every leak occurs suddenly because there will always be an instant in time when a once nonexistent leak "suddenly" develops. The metaphysical moment principle would read the temporal component of the term "sudden" out of the Policy, thus reducing this term to mere surplusage. This court joins the other courts that have rejected the metaphysical moment argument as an unreasonable interpretation of the CGL policy. *See Federated Mut. Ins. Co. v. Botkin Grain Co.,* 64 F.3d 537, 540–41 (10th Cir. 1995) (Kansas law); *American Ins. Co. v. Fairchild Indus.,* 852 F.Supp. 1173, 1182 n. 18 (E.D.N.Y.1994) (New York law), *aff'd,* 56 F.3d 435 (2d Cir.1995).

### d

■ The court holds there are two aspects of a pollution discharge that, if "sudden," are not excluded from insurance coverage.

The first is the period of time that commences with the release of a contaminant and terminates with the cessation of the flow. In the case of a leak, this period represents the time that begins when waste first escapes from its container and ends when the flow ceases. Under this view, the duration of the leak determines the suddenness of the discharge.

The second is the cause of the discharge. The cause is a logical starting point to look for reliable evidence of the nature of the discharge. SnyderGeneral objects to this approach on the ground it would effectively alter the Policy language to read "the *cause* of the discharge must be sudden and accidental," rather than to require that the "dis-

---

**15.** The majority of courts rejects the *Bell Lumber* approach. *See Anaconda Minerals Co. v. Stoller Chem. Co.,* 990 F.2d 1175, 1179 (10th Cir.1993) (joining majority of federal courts holding that discharge, not resulting damage, must be sudden and accidental).

**16.** The time of discovery may roughly approximate the discharge if discharge refers to the continued release of contaminants, and the insured abates the release upon discovery.

charge ... is sudden and accidental," as the pollution exclusion now reads. The court disagrees. When read with the word "accidental," the Policy's focus on causation becomes clearer. The requirement of an accidental discharge means the policyholder cannot intentionally discharge pollution. *E.g., American Motorists Ins. Co. v. General Host Corp.*, 946 F.2d 1482, 1486 (10th Cir.) (accidental refers to pollution not expected or intended by the insured), *vacated in part,* 946 F.2d 1489 (1991). Because intent requires evidence of an insured's predischarge conduct, the court necessarily looks to the cause of the discharge. The phrase "sudden and accidental" modifies the term "discharge," and if the "accidental" prong naturally refers to the cause of the discharge, the "sudden" prong can be read the same way. Under this interpretation, the duration or nature of the cause of the discharge must qualify as sudden.

The court views both interpretations as consistent with insurers' probable intent to limit pollution coverage to events that satisfy a temporal requirement. The sudden and accidental pollution exclusion attempts to deny coverage for intentional polluters. The "accidental" prong of the test already deals with such conduct. But even with an accidental requirement, insureds might engage in sloppy, although unintentional, waste disposal practices over a period of time. The temporal component of sudden bolsters the goal of the accidental prong by providing insureds with the incentive to avoid careless long-term waste disposal practices. As one court stated:

> The policy reasons for the pollution exclusion are obvious: if an insured knows that liability incurred by all manner of negligent or careless spills and releases is covered by his liability policy, he is tempted to diminish his precautions and relax his vigilance. Relaxed vigilance is even more likely where the insured knows that the intentional deposit of toxic material in his dumpsters, so long as it is unexpected, affords him coverage. In this case, it pays the insured to keep his head in the sand.

*Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 381 (1986). By requiring a sudden cause of the discharge, the pollution exclusion provides insureds with the incentive to take precautions against long-term conditions that may lead to pollution damage.

**D**

Under Texas law, the court must adopt the reasonable interpretation of the Policy that is most favorable to SnyderGeneral as the insured. *Truck Ins. Exch. v. Musick,* 902 S.W.2d 68, 70 (Tex.App.1995, writ requested) (holding that if language of insurance policy is capable of more than one construction, policy must be construed in favor of insured); *see also Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665–66 (Tex. 1987). Based on the court's rulings above, the interpretation most favorable to SnyderGeneral requires only that it show that the TCA discharge was unexpected, and that the period of time during which TCA was released was of limited duration. The court therefore determines whether SnyderGeneral has raised a genuine issue of material fact in this respect.

SnyderGeneral has presented evidence that the TCA leak occurred within a 24–hour period.[17] This proof raises a genuine issue of material fact regarding whether the TCA leak was of a limited duration. It is uncontested for purposes of this motion that the leak was unexpected. Accordingly, there is a genuine issue of material fact that precludes summary judgment based on the Policy's pollution exclusion.

**III**

Century contends that SnyderGeneral's use of groundwater at the Wilmington facility excludes coverage under the Policy's "care, custody or control" exclusion.

By endorsement, the Policy excludes coverage for property damage to "property used by the insured" or "property in the care,

---

17. For purposes of its summary judgment motion, Century does not dispute the duration of the TCA leak.

custody or control of the insured or as to which the insured is for any purpose exercising physical control." D.Br. Ex. A. Century does not maintain that SnyderGeneral owned the groundwater. Instead, it posits that, by pumping water from aquifers beneath the Wilmington property and using that water in its manufacturing process, SnyderGeneral exercised control over or used the entire aquifer. *See Joslyn Mfg. Co. v. Liberty Mut. Ins. Co.,* No. 90–1157–JU (D.Ore. Jan. 21, 1993) (Juba, Magis.), *adopted* No. 90–1157–JU, order at 2 (D.Ore. Mar. 23, 1993), *aff'd,* No. 93–35403, 42 F.3d 1400 (9th Cir. Dec. 1, 1994). In *Joslyn* the insured used groundwater as part of its daily operations. The magistrate judge recommended entry of summary judgment because the insured exercised control over the groundwater by using the water in this manner. *Id.* at 11–12.

Texas law follows a different interpretation of the "care, custody, or control" exclusion. In *Hartford Cas. Co. v. Cruse,* 938 F.2d 601 (5th Cir.1991) (Texas law), a contractor defectively performed services while constructing the foundation of a home. The homeowners sued the contractor, and the contractor's insurer denied coverage based partly on the care, custody or control exclusion. The court held that the exclusion did not apply.

> The [homeowners] continued inhabiting the house while [the contractor] worked on the foundation. We thus reject the contention that [the contractor] had care, custody, or control of the entire house. "The cases have limited this control to the particular object of the insured's work, usually personalty, and to other property which he totally and physically manipulates."

*Id.* at 604 (quoting *Goswick v. Employers' Cas. Co.,* 440 S.W.2d 287, 289–90 (Tex.1969)); *see also Goswick,* 440 S.W.2d at 289–90 (holding that insured controlled rods and tubing in repairing oil well pumps, but not oil well).

In this case, SnyderGeneral did not totally and physically manipulate the entire pool of groundwater beneath the Wilmington site. SnyderGeneral's control extended only to the groundwater that it actually pumped out and used. Just as a contractor's work on the

foundation of a house does not amount to control of the entire house, SnyderGeneral's use of a portion of the groundwater does not constitute the use or control of all the groundwater. Therefore, the court rejects Century's contention that the "care, custody or control" exclusion bars SnyderGeneral's claim.

### IV

The court now decides the question that is dispositive of SnyderGeneral's breach of contract action.

Century contends that SnyderGeneral's claim for liability coverage does not constitute "damages" within the meaning of the Policy's insuring agreement. The Policy provides, in pertinent part:

> [Century] hereby agrees ... to indemnify the insured for all sums which the insured shall be obligated to pay by reason of liability a) imposed upon the insured by law ... for damages ... on account of [property damage].

Century reasons that the plain meaning of "damages" refers to the technical distinction between legal damages and equitable relief. Century relies on a federal case that applies Texas law, and on Texas appellate precedent that distinguishes between legal and equitable relief in other insurance contexts.

In *Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.,* 1993 WL 566032 (S.D.Tex.), *appeal docketed,* No. 94–20758 (5th Cir. Oct. 13, 1994), the insured purchased land from a third party. The Environmental Protection Agency ("EPA") subsequently identified the land as polluted, and the insured filed suit seeking rescission of the land sale.[18] The question before the court was whether an action to rescind the sale constituted damages within the insured's liability policy. Based on Texas intermediate appellate cases that distinguished between legal and equitable relief, Judge Rosenthal held that the payment of money on a restitution claim did not qualify as covered "damages." *Id.* at *8.

---

**18.** The insured had already sold a portion of the land to another party at the time of the EPA declaration. That party also sued the insured for rescission of its partial purchase of the land.

1004

In *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 490 (Tex.Civ.App.1970, no writ), the insured used slant drilling techniques to drain oil under the property of other oil companies. The victimized oil companies sued the insured on a conversion theory, seeking in excess of $500,000. *Id.* The insurer denied coverage on the basis that the conversion action, which sought recovery of the property rather than compensation for injury, did not constitute property damage within the meaning of the policy.[19] *Id.* at 491. The court held that a conversion action did not constitute property damage. In a suit for damages, the normal measure of relief would compare the value of the oil leases before and after the alleged slant drilling. *Id.* at 493. By contrast, the insured's suit involved third parties seeking the return of the oil or its market value equivalent.[20] *Id.*

*Mustang Tractor* also relied on a Fifth Circuit opinion that established the same distinction between legal and equitable relief. In *Aetna Cas. & Sur. Co. v. Hanna*, 224 F.2d 499 (5th Cir.1955), the insured owned a partially submerged vacant lot. The insured elevated the lot by filling it with boulders, trash, and dirt, but storm waters caused some of these materials to flow onto adjoining property. *Id.* at 500. In order to compel the insured to remove the filler material from their property, the adjoining property owners filed suit for a mandatory injunction. *Id.* at 500–01. The court held that the action for a mandatory injunction did not constitute "damages" within the meaning of the insured's liability policy[21] because the insured sought to recover the cost of removing the materials. *Id.* at 503. An action for dam-

ages, on the other hand, would involve the difference in the value of the land before and after the injurious event. *Id.*

■■■■ SnyderGeneral makes no attempt to distinguish *Nortex* or *Hanna*. It argues that its cleanup expenses resulted from a legal obligation to pay for property damage to the Wilmington site. SnyderGeneral points out that the Policy does not define the term "damages," and urges that the court should interpret this undefined term in a manner favorable to it as the insured.

Several courts from other jurisdictions agree with SnyderGeneral's position:

> [T]he average person would not engage in a complex comparison of legal and equitable remedies in order to define ... damages, but would conclude based on the plain meaning of words that the cleanup costs imposed on [the insured] ... would constitute an obligation to pay damages. The average businessman does not differentiate between "damages" and "restitution;" in either case, money comes from his pocket and goes to third parties. The average businessman would consider himself covered for cleanup expenditures applicable to others' properties.

*State of New Jersey v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 612 A.2d 932, 944 (1992) (quoting *American Motorists Ins. Co. v. Levelor Lorentzen, Inc.*, 1988 WL 112142, at *3 (D.N.J. Oct. 14, 1988), *aff'd*, 932 F.2d 958 (3d Cir.1991); and *Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314, 1319 (S.D.N.Y.1988), *aff'd*, 887 F.2d 1200 (2d Cir. 1989)). But this court, in its *Erie* role in a case in which there is no definitive Texas Supreme Court decision, must look to the

---

19. In relevant part, the liability policy in *Nortex* provided that the insurer agreed to indemnify the insured for "all sums which the insured shall by law become liable to pay ... as damages for damage to property." *Id.* at 492 n. 2.

20. The other Texas appellate case is *Feed Store, Inc. v. Reliance Ins. Co.*, 774 S.W.2d 73 (Tex.App. 1989, writ denied), which involved a suit by third parties against the insured for trademark infringement. The third parties sought an injunction, but did not seek any monetary relief. The insured contended that the costs of defending the suit qualified as damages, but the court held that injunctive relief did not qualify as damages under

the insured's liability policy. *Id.* at 74. The case is distinguishable from *Nortex* and the instant case because it did not involve a claim for money. Nevertheless, *Feed Store* still suggests that Texas distinguishes between legal and equitable relief when interpreting liability policies.

21. The policy did not differ in any significant respect from the language of the Policy in the present case. The policy in *Hanna* covered "all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law ... for damages because of ... destruction of property[.]" *Id.* at 502.

decisions of Texas intermediate appellate courts. A decision of a Texas court of appeals is controlling on a question of state law absent a strong indication that the Texas Supreme Court would decide the question differently. *Allstate Ins. Co. v. Shelby*, 672 F.Supp. 956, 958 (N.D.Tex.1987) (citing *Mott v. Mitsubishi Int'l Corp.*, 636 F.2d 1073, 1074 (5th Cir.1981)). A federal district court will not lightly reexamine a state intermediate court's decision unless there are persuasive indications that the highest court of the state would decide otherwise. *Id.* (citing *Cormier v. Williams/Sedco/Horn Constructors*, 460 F.Supp. 1010, 1012 (E.D.La.1978)).

■ Neither SnyderGeneral nor the available cases dispute the characterization of environmental response costs as equitable relief. *See Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507, 511 (1990) (recognizing that response costs may be characterized as equitable relief, but construing "damages" to include equitable relief). Environmental cleanup expenses involve an attempt to restore polluted property to its prior state. These expenses may exceed the diminution in value of the polluted property. Because environmental response costs are equitable in nature, the relevant inquiry is whether Texas law distinguishes between legal and equitable relief in liability policies.

■ In *Nortex* the court of appeals held that a conversion action did not qualify as "property damage" within the meaning of a liability policy. The Fifth Circuit's decision in *Hanna* established the same legal versus equitable relief distinction on facts that amounted to a "cleanup" of adjoining property. Although it is not apparent to the court why insurers would generally exclude coverage for liability claims of an equitable nature, environmental cleanup expenses present a more likely setting for distinguishing between legal and equitable relief. Insurers may in fact desire not to cover expenses incurred due to governmental regulation. Because the distinction between legal and equitable relief would appear to have a more plausible explanation in the context of environmental cleanup expenses, the court discerns no basis to distinguish *Nortex* and *Hanna* from the present case.

The court does not find a strong indication that the Texas Supreme Court would reach a different outcome. Although a majority of courts in other jurisdictions appears to favor SnyderGeneral's position, *see, e.g., Boeing,* 784 P.2d at 516 (joining majority of courts holding that environmental response costs are damages), other courts have agreed with *Nortex* and *Hanna* that the term "damages" does not encompass equitable relief. *E.g., Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977, 987 (8th Cir.) (en banc), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). The court therefore treats *Nortex* as the controlling law of Texas.

Following *Nortex,* the court holds that SnyderGeneral's environmental cleanup expenses do not qualify as "damages" under the Policy. These expenses resemble restitution or reimbursement, but not compensation for a traditional legal injury. Accordingly, the court grants Century's motion for summary judgment based on the term "damages" in the insuring agreement of the Policy.

V

Having concluded that Century is entitled to summary judgment dismissing SnyderGeneral's Policy claim, the court now determines whether Century is entitled to summary judgment dismissing SnyderGeneral's claim for breach of duty of good faith and fair dealing and violation of the Texas Insurance Code.

Century maintains that as a consequence of obtaining summary judgment dismissing SnyderGeneral's claim for Policy coverage, it is entitled on the basis of the Texas Supreme Court's recent decision in *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338 (Tex.1995), to dismissal of SnyderGeneral's claim for breach of duty of good faith and fair dealing and violation of the Texas Insurance Code. Alternatively, Century contends that SnyderGeneral cannot demonstrate that it has incurred damages based on its bad faith claim.

## A

In *Stoker* the Texas Supreme Court noted that the insurer had promptly investigated all claims, and that the insured based its Insurance Code claims on the exact facts asserted in its bad faith claims. *Id.* at 340. The court held as a general rule that an insured cannot establish a bad faith claim when the insurer has a reasonable ground for denying coverage. *Id.* at 341. But the court also said, albeit in *dicta*, that there are exceptions:

> We do not exclude, however, the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim. Nor should we be understood as retreating from the established principles regarding the duty of an insurer to timely investigate its insured's claims.

*Id.* (citation omitted).

The Texas Insurance Code lists certain unfair claims and settlement practices by insurers. One of its provisions includes failure to acknowledge an insured's communications with reasonable promptness. Tex.Ins. Code Ann. art. 21.21–2, § 2(b)(2) (West 1981 & Supp.1995). SnyderGeneral seeks recovery pursuant to Article. 21.21, § 16 (West Supp.1995), which allows a private cause of action for *inter alia* violations of Article 21.21.[22] *Stoker* does not deprive SnyderGeneral of its right to pursue an Insurance Code violation. *Stoker* also appears to preserve a failure to investigate claim in at least some situations where the insurer ultimately denies coverage on a proper ground.

By presenting evidence that Century failed completely to respond during a five-year period to three letters requesting coverage, SnyderGeneral has adduced sufficient evidence for a reasonable jury to find that Century failed to acknowledge SnyderGeneral's communications with reasonable promptness, and failed to undertake a reasonable investigation of SnyderGeneral's claim. The court is unable to conclude that Century is entitled to summary judgment.

## B

Century also maintains that SnyderGeneral cannot show any damages for violations of the Insurance Code. At oral argument, SnyderGeneral's counsel conceded that attorney's fees are its only damages. Counsel asserted that Century's failure to investigate SnyderGeneral's claim caused it to incur legal expenses that it would not otherwise have expended.[23]

The summary judgment record reflects that SnyderGeneral retained counsel to press its complaint that Century had not responded to SnyderGeneral's claim for Policy coverage. It is reasonable to infer that SnyderGeneral would not have incurred expenses inquiring into the status of its claim had Century fulfilled its duty to investigate. Therefore, the court denies this aspect of Century's motion for summary judgment.

\* \* \*

Century's motion for summary judgment is granted as to SnyderGeneral's breach of contract claim and declaratory judgment action, and denied as to SnyderGeneral's claim for breach of duty of good faith and fair dealing and violation of the Texas Insurance Code.

**SO ORDERED.**

---

22. The Insurance Code itself does not grant a private cause of action, but § 4(b) of Texas Insurance Board Order 18663 states that conduct determined pursuant to law to be an unfair or deceptive act or practice is actionable pursuant to Article 21.21. *Maryland Ins. Co. v. Head Indus. Coatings & Servs., Inc.,* 906 S.W.2d 218, 225 (Tex.App.1995); *see also Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129, 134–35 (Tex. 1988) (finding lack of good faith in claims processing is unfair or deceptive act and thus actionable under Article 21.21). Article 21.21–2 prescribes a list of unfair practices; therefore, SnyderGeneral has a private right of action.

23. Of course, because the court concludes that Century is not liable pursuant to the Policy, SnyderGeneral cannot circumvent this ruling by obtaining damages for coverage by way of an Insurance Code claim. *See Maryland Ins. Co.,* 906 S.W.2d. at 231 (stating that damages resulting from underlying insurance claim not recoverable as damages resulting from the insurer's conduct).